STATE OF NORTH CAROLINA v. ERIC ALAN OAKES

No. COA09-1280

(Filed 4 January 2011)

**1. Appeal and Error— preservation of issues—failure to argue**

Assignments of error numbered one through four that defendant failed to address in his brief were deemed abandoned under N.C. R. App. P. 28(b)(6).

**2. Criminal Law— prosecutor's arguments—comparing defendant to an animal**

The trial court did not err in a first-degree murder case by failing to intervene *ex mero motu* to address several of the prosecutor's remarks during the State's closing argument. Although comparisons between criminal defendants and animals are disfavored, the use of the analogy in context helped explain the complex legal theory surrounding premeditation and deliberation.

**STATE v. OAKES**

[209 N.C. App. 18 (2011)]

**3. Witnesses— denial of qualification as expert—use of force science—intent irrelevant**

The trial court did not abuse its discretion in a first-degree murder case by denying defendant's motion to have a witness qualified as an expert in "use of force science" and to give expert opinions on that subject. Although defendant asserted prejudice in terms of the denial of an opportunity for a witness to obviate intent, defendant's intent to kill was irrelevant to a consideration of felony murder.

**4. Trials— motion to recuse judge—failure to show objective grounds for disqualification**

The trial judge did not err in a first-degree murder case by failing to recuse himself upon defendant's motion. Defendant failed to demonstrate objectively that grounds for disqualification existed.

**5. Appeal and Error— preservation of issues—managing conduct of trial**

It was the trial court's responsibility in a first-degree murder case to initially pass on any concerns it had with the trial, especially since it was in a better position to observe and control the trial proceedings. The trial court should not abdicate its role in managing the conduct of trial to an appellate court.

Appeal by defendant from judgments entered 26 August 2008 by Judge William C. Griffin, Jr. in Hertford County Superior Court. Heard in the Court of Appeals 25 March 2010.

*Attorney General Roy A. Cooper, III, by Special Deputy Attorney General Diane A. Reeves, for the State.*

*Sue Genrich Berry, for defendant-appellant.*

JACKSON, Judge.

Eric Alan Oakes ("defendant") appeals from the 26 August 2008 judgment entered upon a jury's verdict finding him guilty of first-degree murder and sentencing him to life imprisonment without parole in the custody of the North Carolina Department of Correction. For the reasons set forth below, we hold no error.

On or about 6 July 2002, defendant and Joey Forehand ("Forehand"), defendant's friend from the Army, visited a bar in

Ahoskie, North Carolina. Forehand spoke with a black male at the bar about purchasing ecstasy. Forehand entered the man's vehicle, a yellow Cavalier, and defendant waited in the parking lot. The men drove off, and, when they returned, Forehand told defendant that he had just been robbed by the men from whom he had tried to purchase the ecstasy. Forehand was upset about being robbed, and he and defendant discussed means of getting back Forehand's money. The following week, defendant and Forehand returned to Fort Bragg and purchased a handgun for $50.00. Defendant stated that it was Forehand's idea to purchase the gun but that he contributed $20.00 toward its purchase.

On 12 July 2002, the following week, defendant and Forehand returned to Ahoskie and stayed at Forehand's mother's home. On 13 July 2002, Forehand and defendant planned to drive around the Ahoskie area to look for the men who had robbed Forehand or their car. Forehand went to Wal-Mart, and Forehand indicated that one of the men was in the store. Forehand and defendant left the store and waited in Forehand's car in the parking lot.

Forehand and defendant located Tyrell Deshaun Overton ("Overton"), who was shopping with his family on 13 July 2002. Defendant and Forehand, in Forehand's vehicle, followed Overton's van to a restaurant, where Overton's family exited the vehicle, and Overton drove off alone. While both vehicles were stopped at a traffic light, defendant exited Forehand's vehicle and approached Overton's van. Defendant entered the passenger side of Overton's van and "had the gun out, point[ing] it at him the whole time."

When the light turned green, the cars turned onto Memorial drive and entered the parking lot of the Golden Corral. The State produced a statement by defendant, indicating that he and Overton wrestled over the gun before two shots were fired. After the shots had been fired, defendant returned to Forehand's vehicle, and the two drove away. Eye-witness testimony indicated that Overton and defendant both exited the vehicle, Overton ran toward the Golden Corral, and defendant pointed a gun at Overton and fired at him before returning to Forehand's vehicle.

Dr. Paul Spence ("Dr. Spence")[1] performed an autopsy of Overton's body. Dr. Spence noted that Overton had two gunshot wounds. Dr. Spence concluded that one shot entered Overton's chest

---

1. Dr. Spence is a specialist and was received as an expert in forensic pathology. At the time of Overton's murder, Dr. Spence was working at the Brody School of Medicine at East Carolina University.

and another entered Overton's back. Dr. Spence noted that Overton's body had no trace of soot or gunshot residue, which would indicate that the gunshots could not have occurred within two feet of the body. He also noted that he did not have an opportunity to observe Overton's clothing.

Defendant presented testimony from Dr. M.G.F. Gilliland ("Dr. Gilliland"), another medical examiner, at trial. Dr. Gilliland explained that, in her opinion, the distance the gunshot traveled could only be an arbitrary estimation without Overton's clothes. Dr. Gilliland also testified that Overton had scrapes on the knuckles of his right hand, consistent with a struggle over a handgun.

During trial, defendant presented testimony from Dave Cloutier ("Cloutier"). Defendant attempted to have Cloutier classified as an expert witness in the field of "use of force science." However, the prosecutor objected, and the trial court sustained the objection, allowing Cloutier to testify without being qualified as an expert. Cloutier's testimony contained information regarding the amount of time it takes a person to move his body in various directions, the amount of time it takes to pull a trigger once the decision to do so has been made, and the amount of "trigger pull" it typically requires to activate the trigger and hammer on a semi-automatic handgun on an initial and subsequent shot.

On 21 August 2008, the jury returned a unanimous verdict finding defendant guilty of first-degree murder on the bases of (1) attempted robbery with a dangerous weapon, (2) first-degree kidnapping, and (3) premeditation or deliberation. On 26 August 2008, the jury unanimously recommended that defendant be sentenced to life imprisonment without parole. Defendant appeals.

[1] Preliminarily, we note that defendant expressly abandons his assignments of error numbered one and four. Accordingly, we need not address these assignments of error. *See* N.C. R. App. P. 28(b)(6) (2007) ("Assignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned.").

[2] In defendant's second assignment of error, he contends that the trial court committed reversible error by failing to intervene *ex mero motu* to address several of the prosecutor's remarks during the State's closing argument that purportedly violated defendant's rights to due process and a fair trial as secured by the Fifth, Sixth, and

Fourteenth Amendments to the United States Constitution and Article I, sections 18, 19, 23, 24, and 27 of the North Carolina Constitution. We disagree.

Defendant failed to object to the State's closing argument at trial. As such, our review is limited to " 'whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu.*' " *State v. Taylor*, 362 N.C. 514, 545, 669 S.E.2d 239, 265 (2008) (quoting *State v. McNeill*, 360 N.C. 231, 244, 624 S.E.2d 329, 338, *cert. denied*, 549 U.S. 960, 166 L. Ed. 2d 281 (2006)). "Under this standard, only an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *Id.* (citations and internal quotation marks omitted). "To establish such an abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *State v. Davis*, 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998). Furthermore, our Supreme Court has explained that,

> in order to constitute reversible error, the prosecutor's remarks must be both improper and prejudicial. Improper remarks are those calculated to lead the jury astray. Such comments include references to matters outside the record and statements of personal opinion. Improper remarks may be prejudicial either because of their individual stigma or because of the general tenor of the argument as a whole. . . . Such tactics risk prejudicing a defendant . . . by improperly leading the jury to base its decision not on the evidence relating to the issues submitted, but on misleading characterizations, crafted by counsel, that are intended to undermine reason in favor of visceral appeal.

*State v. Jones*, 355 N.C. 117, 133-34, 558 S.E.2d 97, 107-08 (2002) (internal citation omitted).

In the case *sub judice*, the prosecutor made the following remarks during the State's closing argument, which now are challenged on appeal:

> Now [the assistant district attorney] gave you an analogy of the octopus. When I was thinking about this case and what to argue to you in this case, ladies and gentlemen, I thought about two things. One, you watch the Wild Kingdom shows. Ya'll [sic] have

**STATE v. OAKES**

[209 N.C. App. 18 (2011)]

seen the National Geographic Wild Kingdom shows. And you have these tigers or you have these cheetahs or the black panthers. And I watch them. And I wince when I see the end of it. But I watch those shows because you watch those panthers and you watch those tigers and what do they do? They hunt.

What they do is they will watch their intended victim, which is usually an antelope or pretty little beer [sic] or gazelle. And they will watch it and they will lay [sic] in that high grass. And you watch it and they will lay [sic] there and they will watch every movement of that dear [sic] or that gazelle or that antelope. And then they follow them. And most of the time the antelope or the gazelle will get attacked. Ya'll [sic] have seen those shows. They usually run in packs of four, ten, twenty.

And what the tiger has to do is the tiger has to make a decision. And you can almost see him making the decision, well, I can attack him, I can attack one of the gazelles in the pack. Or what do they normally do, ladies and gentlemen, when you watch that TV show? They normally wait until that gazelle or that deer goes over to a brook and gets something to drink and separates from the pack. And then they go in for the kill. And then that's when you seem them grab them, chew them in half, the blood goes everywhere and everybody cuts the TV off. But that's what they do. That's how they kill things. They hunt them.

Now, ladies and gentlemen, that's exactly what this man did. He hunted Tyrell Overton. . . .

. . . .

Because, ladies and gentlemen, the State contends that if you are sitting [at] a stoplight and somebody gets in your car and points a gun at your head and says you drive, it's just like that thing about the panther and the tiger again.

. . . .

He got him at the stoplight because they saw Tyrell Overton when he dropped his family off. Separated him from the pack. Okay?

. . . .

And the State has proven beyond a reasonable doubt that when you hunt somebody down like an animal and you kill them and you indicate [sic] seven months and when the cops are at your

friend's house and you slump down in the seat hoping you are not going to get caught, that's first-degree murder. . . .

Both this Court and our Supreme Court have expressed consistent disapproval of improper arguments by the State that appeal not to the evidence or reason, but rather, to emotions, a prosecutor's personal opinion or experience, or visceral reaction, including—as here—drawing comparisons between a criminal defendant and members of the animal kingdom. *See, e.g., State v. Roache*, 358 N.C. 243, 297-98, 595 S.E.2d 381, 416 (2004) (explaining that the prosecutor improperly argued that " '[defendant and Lippard] packed up like wild dogs—*they were high on the taste of blood and power over their victims*. And just like wild dogs, if you run with the pack you are responsible for the kill[,]' " because the argument " 'improperly [led] the jury to base its decision not on the evidence relating to the issue submitted, but on misleading characterizations, crafted by counsel, that are intended to undermine reason in favor of visceral appeal[,]' " but holding that the trial court did not err by failing to intervene *ex mero motu* in view of overwhelming evidence of the defendant's guilt) (citation omitted) (emphasis added) (second and fourth alterations added); *State v. Smith*, 279 N.C. 163, 165-67, 181 S.E.2d 458, 459-61 (1971) (granting a new trial for the trial court's failure to intervene *ex mero motu* after the solicitor had called the defendant a liar, asserted that he knew when to seek a conviction in a capital case and when not to do so, conducted a "tirade" in front of the jury, and characterized the defendant as being "lower than the bone belly of a cur dog" for his alleged transgressions); *Jones*, 355 N.C. at 133-34, 558 S.E.2d at 107-08 (holding that the prosecutor's argument was improper and prejudicial when, during the State's closing argument, the prosecutor referenced the defendant by stating, " 'You got this quitter, this loser, this worthless piece of—who's mean. . . . He's as mean as they come. He's lower than the dirt on a snake's belly[,]' " because the prosecutor purposefully attempted to shift the jury's focus from the jury's opinion of the defendant's character to the prosecutor's opinion, and the prosecutor attempted to steer the jury from its role as fact-finder by appealing to its passions or prejudices); *State v. Brown*, 13 N.C. App. 261, 269-70, 185 S.E.2d 471, 476-77 (1971) (noting the Court's disapproval of the solicitor's referring to the defendant as an "animal," but explaining that, on the facts in that case, the Court could not hold that the defendant had been prejudiced by the State's characterization), *cert. denied*, 280 N.C. 723, 186 S.E.2d 925 (1972). *But see State v. Bell*, 359 N.C. 1, 19-20, 603

S.E.2d 93, 107 (2004) (holding that the prosecutor's use of an analogy —comparing the co-defendants to a pack of hyenas who stalk their prey, as may be seen on "those nature shows"—was not abusive and improper when, in context, the analogy helped to explain the complex legal theory of acting in concert with the use of the phrase, "he who hunts with the pack is responsible for the kill"); *accord State v. Goode*, 341 N.C. 513, 546-47, 461 S.E.2d 631, 650-51 (1995) (holding that the prosecutor's statement, "he who runs with the pack is responsible for the kill," was not improper when it explained the legal theory of acting in concert and the argument was supported by the evidence).

Pursuant to the foregoing authority, we hold that, on these facts, the prosecutor's remarks were not improper. The State was pursuing defendant's conviction for the first-degree murder of Overton on the theory that defendant committed the murder with premeditation and deliberation and in the course of an attempted armed robbery and first-degree kidnapping. We reiterate that comparisons between criminal defendants and animals are *strongly* disfavored, but we are convinced by the State's argument on appeal that the use of the analogy, in context, helps to explain the complex legal theory surrounding premeditation and deliberation.

Here, the State presented evidence of a statement written by defendant in which he explained that Forehand had been robbed by several men when Forehand tried to buy drugs. According to defendant's statement, after Forehand was robbed, he and defendant returned home, and, on the following weekend, the two men

> went back looking for the male [who had robbed Forehand the previous weekend] so we could get the money back. We saw the male at Wal-Mart so we waited outside for him. When he came out, we followed him until he came to a stoplight. I jumped out and got in the male's vehicle. . . . [H]e tried to take the gun from me. While we were struggling, the gun went off. He then came at me again and I shot him.

The State also introduced a supplement to defendant's written statement in which defendant explained that Forehand first had the idea to get a gun in preparation for their return to Ahoskie and that defendant contributed $20.00 toward its purchase. Defendant further explained that he and Forehand awoke Saturday morning to look for the men who previously had robbed Forehand. Forehand recognized

one of the men, Overton, at Wal-Mart, and Forehand and defendant followed Overton from Wal-Mart to a Kentucky Fried Chicken restaurant where Overton dropped off his family. Defendant then detailed how he and Forehand followed Overton to a stoplight at which defendant exited Forehand's vehicle and entered Overton's vehicle, carrying the gun that he had helped to purchase. While in Overton's van, he and defendant struggled; the gun went off, and, when Overton reached for the gun again, defendant shot him a second time.

Accordingly, having reviewed the remainder of the State's closing argument, evidence, and theory of the case to provide the necessary context to review the State's analogy, we hold that the challenged portions of the prosecutor's remarks were not so grossly improper so as to warrant the trial court's intervention *ex mero motu*, and defendant's first assignment of error is overruled.

**[3]** Next, defendant argues that the trial court erred and that he was prejudiced by the court's denial of defendant's motion to have Cloutier qualified as an expert in "use of force science" and to give expert opinions on that subject. We disagree.

North Carolina Rules of Evidence, Rule 702(a) provides that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion." N.C. Gen. Stat. § 8C-1, Rule 702(a) (2009). Furthermore, North Carolina Rules of Evidence, Rule 104(a) establishes that "[p]reliminary questions concerning the qualification of a person to be a witness . . . shall be determined by the court . . . ." N.C. Gen. Stat. § 8C-1, Rule 104(a) (2009). Trial courts are not bound by the rules of evidence when making these determinations. *Id.* It is well established that "trial courts are afforded 'wide latitude of discretion when making a determination about the admissibility of expert testimony.' " *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004) (quoting *State v. Bullard*, 312 N.C. 129, 140, 322 S.E.2d 370, 376 (1984)).[2] Similarly, "our trial courts are . . . vested with broad discretion to limit the admissibility of expert testimony as necessitated by the demands of each case." *Id.* at 469, 597 S.E.2d at 692. Accordingly, the trial court's ruling "will not be reversed on appeal

_____

2. We rely upon *Howerton* because, as noted in a recent Supreme Court dissent, "[t]here is only one evidentiary standard for expert testimony." *State v. Ward*, 364 N.C. 133, 156, 694 S.E.2d 738, 752 (2011) (Newby, J., dissenting).

absent a showing of abuse of discretion." *Id.* at 458, 597 S.E.2d at 686 (citations omitted).

Additionally, in *Howerton,* our Supreme Court

> set forth a three-step inquiry for evaluating the admissibility of expert testimony: (1) Is the expert's proffered method of proof sufficiently reliable as an area for expert testimony? (2) Is the witness testifying at trial qualified as an expert in that area of testimony? (3) Is the expert's testimony relevant?

*Id.* (citing *State v. Goode,* 341 N.C. 513, 527-29, 461 S.E.2d 631, 639-41 (1995)) (internal citations omitted).

In the case *sub judice,* defendant shot Overton two times. One wound was to Overton's chest; the other was to his back. Defendant sought to have Cloutier admitted as an expert in the use of force to testify with respect to threat assessment and reaction times to demonstrate that "a person can turn his body 90 degrees faster than a person can pull a trigger *once the decision has been made to pull the trigger.*" (Emphasis added). Defendant asserts that "Mr. Cloutier's opinion that the two gunshots in this case would have occurred within the confines of the vehicle and during the course of a struggle went to the heart of the defense in this case." Defendant further asserts that "this view of the evidence points away from the specific intent to kill in premeditated and deliberate murder and the intent elements of attempted robbery with a dangerous weapon and first-degree kidnapping."

Notwithstanding defendant's assertions, in *State v. Bunch,* 363 N.C. 841, 846-47, 689 S.E.2d 866, 870 (2011), our Supreme Court set forth a comprehensive exposition of the felony murder rule in North Carolina:

> Felony murder is defined by statute in N.C.G.S. § 14-17,[3] and this Court has confined the offense to "only two elements: (1) the defendant knowingly committed or attempted to commit one of the felonies indicated in N.C.G.S. § 14-7, and (2) a related killing." *State v. Thomas,* 325 N.C. 583, 603, 386 S.E.2d 555, 567 (1989) (citations omitted). Similarly, in *State v. Richardson,* this Court

---

3. " 'A murder . . . which shall be committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree . . . .' " *Bunch,* 363 N.C. at 846 n.2, 689 S.E.2d at 870 n.2 (quoting N.C. Gen. Stat. § 14-17 (2007)).

explained that "the elements necessary to prove felony murder are that [1] the killing took place [2] while the accused was perpetrating or attempting to perpetrate one of the enumerated felonies [in N.C.G.S. § 14-17]." 341 N.C. 658, 666, 462 S.E.2d 492, 498 (1995). Finally, this Court described felony murder in *State v. Jones* as follows: "[1] When a killing is committed [2] in the perpetration of an enumerated felony (arson, rape, etc.) or other felony committed with the use of a deadly weapon, murder in the first-degree is established . . . ." 353 N.C. 159, 164, 538 S.E.2d 917, 922 (2000) (citations omitted). Moreover, in *State v. Collins*, this Court commented that "causation . . . must be established in order to sustain a conviction for any form of homicide, either murder or manslaughter." 334 N.C. 54, 57, 431 S.E.2d 188, 190 (1993); *id.* at 60-61, 431 S.E.2d at 192.

(Original footnote call number modified). Thus, the intent element for felony murder relates to the intent to commit the underlying felonies enumerated in North Carolina General Statues, section 14-17. *See id. See also State v. Thomas*, 325 N.C. 583, 603, 386 S.E.2d 555, 567 (1989) ("*Whether the defendant* committed the killing himself, *intended that the killing take place*, or even knew that a killing might occur *is irrelevant*. More specifically, a killing during the commission or attempt to commit one of the felonies indicated in the statute is murder in the first-degree without regard to premeditation, deliberation or malice.") (internal citations omitted) (emphasis added).

Here, the verdict sheet sets forth the jury's unanimous findings that defendant was "[g]uilty of first-degree murder: [o]n the basis of attempted robbery with a dangerous weapon; [o]n the basis of first-degree kidnapping; *[and]* [o]n the basis of premeditation and deliberation[.]" (Emphasis added). Although defendant attempts to assert prejudice in terms of the denial of an opportunity for a witness to obviate that intent through testimony under the guise of an expert,[4] defendant's intent to kill is irrelevant to a consideration of felony murder. *See id.* Furthermore, the State's evidence, including defendant's statement, plainly sets forth defendant's intent to commit the felony—attempted robbery with a dangerous weapon—during which the killing occurred. Accordingly, we hold that defendant was

4. We note that, although the trial court did not allow Cloutier to testify as an expert, Cloutier still presented the testimony defendant sought, albeit under the guise of a lay witness. *But cf. State v. Armstrong*, —— N.C. App. ——, ——, 691 S.E.2d 433, 442-43 (2010); *id.* at ——, 691 S.E.2d at 447 (holding no prejudicial error upon review of the defendant's argument that he was prejudiced by, *inter alia*, the State's use of "expert opinion masquerading as lay testimony").

STATE v. OAKES

[209 N.C. App. 18 (2011)]

not prejudiced by the trial court's denial of defendant's motion that Cloutier be received as an expert witness in the use of force in the case *sub judice*.

[4] In defendant's third argument on appeal, defendant contends that the trial judge erred by not recusing himself upon defendant's motion. We disagree.

In relevant part, North Carolina General Statutes, section 15A-1223 provides that

> [a] judge, on motion of the State or the defendant, must disqualify himself from presiding over a criminal trial or other criminal proceeding if he is . . . [p]rejudiced against the moving party or in favor of the adverse party . . . .

N.C. Gen. Stat. § 15A-1223(b)(1) (2009). The North Carolina Code of Judicial Conduct requires that,

> [o]n motion of any party, a judge should disqualify himself/herself in a proceeding in which the judge's impartiality may reasonably be questioned, including but not limited to instances where . . . [t]he judge has a personal bias or prejudice concerning a party.

Code of Judicial Conduct Canon 3(C), 2010 Ann. R. N.C. 518-19.[5]

A judge's impartiality also implicates both federal and state constitutional due process principles. *See, e.g., Tumey v. Ohio*, 273 U.S. 510, 523, 71 L. Ed. 749, 754 (1927) (explaining that the Fourteenth Amendment's due process guarantee would have been violated if an impartial judge had not presided over the case); *State v. Miller*, 288 N.C. 582, 598, 220 S.E.2d 326, 337 (1975) ("The substantive and procedural due process requirements of the Fourteenth Amendment mandate that every person charged with a crime has an absolute right to a fair trial before an impartial judge and an unprejudiced jury.").

We previously have explained that,

> [w]hen a party requests such a recusal by the trial court, the party must demonstrate objectively that grounds for disqualification actually exist. The requesting party has the burden of showing through substantial evidence that the judge has such a personal bias, prejudice or interest that he would be unable

---

5. Canon 3 was amended last in 2006. Therefore, the 2010 version of the North Carolina Code of Judicial Conduct reflects the same principles that were applicable during the proceedings at issue here.

to rule impartially. If there is sufficient force to the allegations contained in a recusal motion to proceed to find facts, or if a reasonable man knowing all of the circumstances would have doubts about the judge's ability to rule on the motion to recuse in an impartial manner, the trial judge should either recuse himself or refer the recusal motion to another judge.

*In re Faircloth,* 153 N.C. App. 565, 570, 571 S.E.2d 65, 69 (2002) (internal citations and quotation marks omitted).

Our Supreme Court has qualified the foregoing by noting that the bases for disqualification set forth in North Carolina General Statutes, section 15A-1223 are not exclusive, and that resorting solely to section 15A-1223 does not end the proper inquiry. *State v. Fie,* 320 N.C. 626, 628, 359 S.E.2d 774, 775 (1987). Furthermore,

[i]t is not enough for a judge to be just in his judgment; he should strive to make the parties and the community feel that he is just; he owes this to himself, to the law and to the position he holds. . . . The purity and integrity of the judicial process ought to be protected against any taint of suspicion to the end that the public and litigants may have the highest confidence in the integrity and fairness of the courts.

*Id.* at 628, 359 S.E.2d at 775-76 (internal citations and quotation marks omitted).

We have held that a defendant was deprived of a fair and impartial trial when the judge's words and actions "set a tone of fear at the trial," and "created an impermissibly chilling effect" that likely affected the defendant's counsel's ability to examine witnesses. *See State v. Wright,* 172 N.C. App. 464, 468-71, 616 S.E.2d 366, 369-70, *aff'd,* 360 N.C. 80, 621 S.E.2d 874 (2005) (per curiam). However, not every instance of a judge's impatience, "acerbic" remarks, or failure to demonstrate "a model of temperateness," when viewed in the totality of circumstances, deprives a defendant of a fair trial. *See State v. Fuller,* 179 N.C. App. 61, 69-70, 632 S.E.2d 509, 514-15, *appeal dismissed,* 360 N.C. 651, 637 S.E.2d 180 (2006) (distinguishing *Wright*). *Cf. Liteky v. United States,* 510 U.S. 540, 555-56, 127 L. Ed. 2d 474, 491 (1994) ("*Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even

a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.") (emphasis in original).

In the case *sub judice,* after thorough review of the parties' appellate briefs, the parties' oral arguments, and relevant portions of the voluminous transcripts created during defendant's trial and pre-trial motions' hearings, we are convinced that defendant has failed to "demonstrate objectively that grounds for disqualification actually exist." *In re Faircloth,* 153 N.C. App. at 570, 571 S.E.2d at 69 (citation and quotation marks omitted). Defendant bases his argument on appeal on four grounds: (1) excerpts from a pretrial motions hearing conducted on 11 September 2007, (2) excerpts from a pretrial motions hearing conducted on 4 February 2008, (3) excerpts from a *voir dire* hearing on defendant's trial counsel's motion to recuse on 11 August 2008, and (4) an assertion that "the trial court was often dismissive of defense counsel's efforts and made a number of rulings unfavorable to the Defendant."

Initially, with respect to defendant's assertion that the trial court often was dismissive of counsel's efforts and that the court made rulings against defendant, we note that defendant fails to support this sweeping assertion with specific examples of impropriety at trial or the "efforts" of which the court was "dismissive." We also note that even the most optimistic advocate could not reasonably expect to advance through a trial such as this without some rulings being made against his party's interests. Without more argument or support, this contention is without merit.

With respect to 11 September 2007, defendant's trial counsel sought to have the District Attorney and her staff disqualified from trying the case on the theory that the District Attorney might be needed as a defense witness. The judge stated that

> I don't have any doubt at this point, Mr. Sutton, that that's exactly what you are doing is laying the groundwork to try to put error in the case. I mean, that's exactly what's going on here. I've been listening to it for an hour. I think I understand what's going on here.

However, the court already had determined that the potential danger envisioned by defendant's trial counsel—having the District Attorney testify as a witness for the defense—would not occur because she would not be able to testify as to inadmissible information concerning plea negotiations. The foregoing statement from the trial judge is the harshest cited by defendant, and it wholly fails to meet

the objective criteria required for recusal. Defendant's remaining concerns from the 11 September 2007 hearing similarly fail when read in context.

With respect to the 4 February 2008 hearing, defendant argues that the following colloquy demonstrates the trial judge's bias:

> THE COURT: Let me make one inquiry. I was told when we quit for lunch ya'll [sic] had arrived at some trial date agreement. Is that correct?
>
> [PROSECUTOR]: Yes, sir, the State has, Judge. We have talked about the different dates that both sides wanted to take into account all the different things that have happened, Judge. I think everybody has agreed—I'm not going to speak for ya'll [sic]—but August 11. . . .
>
> . . . .
>
> THE COURT: Of course you know the Court's feeling is that the case needs to be tried more quickly than that, however, if everybody is committed to getting the case tried at that time I'll bite my tongue and let you schedule it. . . .
>
> [DEFENSE COUNSEL]: Your Honor, I think you can see what we have done to try to get records. We are trying as hard as we can. And his previous lawyer got disbarred and we have never been able to talk to her. We are doing our level best we can, Judge.
>
> . . . .
>
> [PROSECUTOR]: Judge, if I could, this date was agreed upon. I don't think that anybody has said that was the date that agreed upon, the defendant. And we went back and forth on dates now.
>
> . . . .
>
> [DEFENSE COUNSEL]: But we didn't ask for that. We asked for 15 months.
>
> THE COURT: I don't care how much you asked for.
>
> [DEFENSE COUNSEL]: Then why are you asking us if we agreed?. . . .
>
> THE COURT: . . . It's [been] five and a half years. The public and your client need this case resolved. The bar and this State ought to be ashamed that we can't get cases tried more quickly than this and do a good job.

[DEFENSE COUNSEL]: Your Honor, why does the Court feel it necessary —

THE COURT: Mr. Sutton, don't start. Step out and talk to Mr. Warmack and Mr. Dixon.

[DEFENSE COUNSEL]: Your Honor, I object to the Court's comments on the record about the bar ought to be embarrassed.

THE COURT: Mr. Sutton, step out of the courtroom.

[DEFENSE COUNSEL]: I can't leave until the hearing is over.

THE COURT: It's over.

[DEFENSE COUNSEL]: Thank you, Your Honor.

THE COURT: Mr. Sutton, I don't know who's going to be here to try this case in August but if I'm here I want you to know that I will not tolerate your talking back to the Court and arguing to the Court. I will not tolerate it.

[DEFENSE COUNSEL]: Then I would ask that you not hear it.

THE COURT: Step out.

With respect to the judge's statement that "[t]he bar and this State ought to be ashamed that we can't get cases tried more quickly than this and do a good job[,]" we note that it was not directed for or against a particular party or position. Rather, the court admonished the attorneys generally in view of the fact that more than five and one-half years had elapsed between defendant's indictment and his trial notwithstanding the fact that defendant's prior counsel had been disbarred—one reason for a portion of the delay. The remainder of the judge's admonishment to defendant's trial counsel—namely that the judge would "not tolerate . . . talking back to the Court and . . . arguing to the Court"—does not impart an objective bias or partiality. It does, however, reflect a call to order and anticipate a trial with appropriate professional decorum. A review of the record at trial, however, demonstrates that the court's admonishment did not "create[] an impermissibly chilling effect on the trial process." *Wright*, 172 N.C. App. at 471, 616 S.E.2d at 370.

With respect to the 11 August 2008 hearing, the court heard and considered defendant's evidence, including, *inter alia*, defendant's concerns with respect to the 11 September 2007 and 4 February 2008 hearings discussed *supra*. The court also considered defendant's trial

counsel's statements relating to a prior case—distinct from the one at issue—during which, counsel asserts, he temporarily was hospitalized for gastrointestinal pains notwithstanding having a trial calendared that day with the same judge presiding over the case *sub judice*. Counsel asserted that the judge called and inquired with counsel's doctor about counsel's medical treatment and accused counsel of "malingering." These prior incidents, defendant argues, demonstrate the trial judge's bias against defendant's trial counsel. Upon review of the record of the case *sub judice*, defendant fails to demonstrate that any prior interactions between the trial judge and his trial counsel in any way affected his trial. Our review of the record does not demonstrate any chilling effect, and defendant cites none. *See Wright*, 172 N.C. App. at 471, 616 S.E.2d at 370. Furthermore, the proceedings do nothing to cast the "taint of suspicion" on "[t]he purity and integrity of the judicial process[.]" *See Fie*, 320 N.C. at 628, 359 S.E.2d at 775 (citations and internal quotation marks omitted).

Accordingly, defendant's argument that the trial court erred by denying his motion for recusal is without merit.

[5] Finally, we write to caution the trial court with respect to the following statement:

> The other thing I want to do is put on the record that I leave to the appellate courts whether or not any recommendation as to discipline should be made to any of the responses or conduct of the attorneys based upon the record in this case as to whether any of the Rules of Practice or Rules of Conduct have been violated.

It is unclear whether the statement related to (1) the issue of the State's closing arguments, (2) the exchanges between defendant's trial counsel and the trial court, (3) another specific, albeit unarticulated reason, or (4) other general concerns. Nonetheless, it is the trial court's responsibility initially to pass on these concerns if the court has them, especially in view of the fact that the trial court is in a better position than a Court of the Appellate Division both to observe and control the trial proceedings. *See, e.g., Augur v. Augur*, 356 N.C. 582, 586, 573 S.E.2d 125, 129 (2002) ("[T]rial courts are more adept than appellate courts at . . . litigation supervision . . . ." (citing *Salve Regina Coll. v. Russell*, 499 U.S. 225, 233, 113 L. Ed. 2d 190, 199 (1991)). It is not for the trial court to abdicate its role in managing the conduct of trial to an appellate court whose task is to review the cold record.

For the foregoing reasons, we hold no error.

No Error.

Judges ELMORE and STROUD concur.

Judge JACKSON concurred prior to December 31, 2010.