STATE OF NORTH CAROLINA v. CHARLES O'BRIEN TEAGUE

No. COA11-39

(Filed 4 October 2011)

**1. Homicide—attempted murder—intent to kill—evidence sufficient**

There was more than sufficient evidence of defendant's intent to kill to permit both counts of attempted murder to be presented to a jury in a prosecution for attempted murder.

**2. Criminal Law—prosecutor's arguments—defendant as predator**

The trial court did not abuse its discretion in not intervening *ex mero motu* in the prosecutor's closing arguments in a prosecution for attempted murder and other offenses where the prosecution compared the victims to sheep and defendant to a predator. As there were conflicting arguments and interpretations of the State's evidence as to whether defendant had the intent to kill and committed these acts with premedication and deliberation, the disputed portions of the prosecutor's closing argument were made in furtherance of the State's duty to strenuously present its case.

Appeal by defendant from judgments entered on or about 16 April 2010 by Judge R. Stuart Albright in Superior Court, Randolph County. Heard in the Court of Appeals 17 August 2011.

*Attorney General Roy A. Cooper, III, by Assistant Attorney General Richard J. Votta, for the State.*

*Anne Bleyman, for defendant-appellant.*

STROUD, Judge.

Charles O'Brien Teague ("defendant") appeals from a conviction for two counts of attempted first-degree murder, robbery with a dangerous weapon, and larceny of a motor vehicle. For the following reasons, we find no error in defendant's trial.

I. Background

On 23 June 2008, defendant was indicted on two counts of first-degree kidnapping, two counts of attempted first-degree murder, larceny of a motor vehicle, and robbery with a dangerous weapon. On 21

July 2008, by separate indictment defendant was also indicted for one count of second-degree kidnapping. On 8 December 2008, defendant was indicted by superseding indictment with two counts of first-degree kidnapping. Defendant was tried on these charges during the 13 April 2010 Criminal Session of Superior Court, Randolph County. The State's evidence presented at trial tended to show the following: Maranda Teague married defendant when she was 17 years old and shortly thereafter became pregnant. Because they did not have their own place, defendant and Maranda lived with defendant's parents until they were asked to leave on or about 26 April 2008, when Maranda was around eight and a half months pregnant. Maranda then went to live with Wanda and Cecil Burke Myers, as Wanda had helped raise Maranda since she was a baby. However, Wanda and Burke did not allow defendant to live in or visit their home because he did not have a job and they did not trust him. In fact, the Myers did not even want defendant to know where they lived. However, Wanda allowed Maranda and defendant to talk on the phone. Maranda testified that she had talked to defendant at the Myers' residence one night without their knowledge, when defendant drove to their residence in a "gray color" Dodge, and defendant had told her that he did not want her staying with the Myers anymore. On 5 May 2008, Wanda came home from work at lunch and saw Maranda and defendant returning in his car to their residence and told defendant he "needed to leave[,]" and if Burke found out defendant had been there, he would probably tell Maranda to leave. After returning to work, Wanda sent her daughter-in-law, Jennifer Walker, to her house to check on Maranda. Ms. Walker found defendant at the Myers' residence and told him that "he wasn't allowed there[.]" Defendant got angry and cursed her telling her that "he had a right to be there" because Maranda was his wife and then "got in the car and spun out of the driveway."

In the early morning hours of 6 May 2008, defendant entered the Myers' home without their permission, while Maranda and the Myers were asleep. Wanda testified that after locking the doors, she went to bed around 11 p.m., and was awakened by her husband moving in bed and then something sharp sticking her in the neck. Wanda was cut twice in the throat and on her hand. After realizing that something was happening, Wanda rolled out of bed and saw someone leaving their bedroom. Burke testified that he awoke in the early morning hours of 6 May 2008 and saw defendant cutting his throat and his wife's throat with a knife. After following the person out of the bedroom, Wanda went to the hallway and saw defendant standing holding the hedge clippers and a knife; she then noticed that her neck was

dripping blood where she had been cut. Defendant then began arguing with Maranda accusing her of "sleeping with his daddy and his brothers and everybody[,]" and told Maranda "if [she] didn't tell him the truth he was gonna kill [her], too." Defendant told Maranda that "he was gonna kill [them] all." While they were arguing, Wanda and Burke went to the bathroom and Wanda saw that Burke had been cut in the throat and on his face, as part of his jaw was "hanging down[.]" Burke wrapped a towel around his neck to stop the bleeding, but there was "a lot of blood" coming out of his wounds. Defendant then entered the bathroom with the knife, and ordered Wanda and Burke to get into the bathtub, telling them "I should have just finished what I started." Wanda stated that she was "[s]cared to death[.]" Maranda was in the hall begging defendant to leave them alone and telling him "if he wanted to kill somebody to kill her[.]" Burke told defendant that he was getting weak from the loss of blood and defendant allowed Burke and Wanda to go sit on the bed. Burke thought that in the bedroom defendant "was gonna finish the job up."

In an effort to get defendant to leave, Burke told defendant he could take $600, their red Dodge Neon car, and Maranda and go to Virginia, Mexico, or Myrtle Beach, South Carolina. Thirty to forty five minutes after the initial attacks, defendant agreed with Burke and left the Myers' residence with their car, the money, and Maranda. Wanda then called 911. Maranda testified that after leaving the Myers' residence with defendant, they got a motel room in Greensboro. Defendant told Maranda that "he felt like [the Myers] were trying to keep me away from him." Defendant and Maranda then traveled to Myrtle Beach in the Myers' car and checked into a hotel; defendant still had the knife with him in the car. Maranda began having stomach pains so defendant tried to take her to the hospital. Defendant stopped a police officer in Myrtle Beach to ask for directions to the hospital but when they arrived at the hospital there were three police patrol vehicles at the entrance of the hospital so they abandoned the car on the side of the road and ran through the woods to the beach. The next day the police apprehended defendant and Maranda while they were walking on the beach and took them into custody.

Dr. David Moore, a physician specializing in ear, nose, and throat medicine, testified that he treated Wanda's injuries to her throat and Burke's injuries to his face and throat. Dr. Moore testified that Wanda received two horizontal lacerations to her throat, with the upper wound penetrating "through the skin and fat underneath the skin" and the lower wound penetrating deeper through the skin, fat, and

the "first layer of muscle[.]" Neither wound penetrated to the nerves or blood vessels of the neck. Dr. Moore estimated that it took around forty stitches to repair these wounds. As to Burke, Dr. Moore testified that his wounds were more extensive, as the lacerations to his face went from just below his left ear to the corner of his mouth and penetrated "through the facial artery," requiring "ligating off and sewing it off[.]" Burke was cut three or four times in the neck and those lacerations were "quite deep" as they

> went through the skin, through the fatty tissue, through the platysma, through the deeper layer of fat, through the strap muscles, and into the sternocleidomastoid muscle. But it didn't go into the trachea, the windpipe, which would be one layer down from those muscles, and it didn't affect the great vessels—the carotid artery or the internal jugular vein, and it didn't affect any major nerves in the neck either[.]

Dr. Moore testified that it took two hours to repair the lacerations to Burke. Wanda testified that at the hospital they stitched up her neck wound and she had surgery on her hand to repair a tendon. Burke testified that he had three surgeries, including reconstructive surgery, to repair the lacerations to his face.

Detective Derrick Hill with the Randolph County Sheriff's Department, investigated the scene at the Myers' residence on the day in question and found a pair of generic binoculars under the Myers' back porch and discovered a grassy area to the right of the back porch that had been flattened out "as if someone had been sitting, kneeling, or laying in that particular location." Deputy Victor Welch with the Randolph County Sheriff's Department, investigated an abandoned silver Dodge Neon a short distance from the Myers' residence and after running the tag it came back as stolen. Inside the vehicle, Deputy Welch discovered a Walmart blister pack for a pocketknife and a receipt from Walmart dated 5 May 2008 for a pair of binoculars and a folding knife. Detective Hill testified that upon viewing the security video at Walmart, he saw an individual matching the description of defendant purchasing a pair of binoculars and a folding knife on 5 May 2008.

Lester Cook, a detective with the Myrtle Beach Police Department, searched the abandoned red Dodge Neon near the hospital and discovered a pocketbook, camera, and a knife with what appeared to be blood on it. Officer Bobby Jordan with the Myrtle Beach Police Department recovered a black knife from the passenger

side of the red Dodge Neon. A search of defendant's person upon arrest revealed a black folding knife in his front right pocket.

At the close of the State's evidence, defendant moved to dismiss all charges for lack of sufficient evidence. The trial court dismissed both counts of first-degree kidnapping, but submitted to the jury the charges of two counts of first-degree attempted murder, robbery with a dangerous weapon, misdemeanor breaking and entering, false-imprisonment, and larceny of a motor vehicle. After stating that he would not be presenting any evidence, defendant renewed his motion to dismiss, which was denied by the trial court.

On 16 April 2010, the jury found defendant guilty of two counts of attempted first-degree murder, robbery with a dangerous weapon, and larceny of a motor vehicle. The trial court sentenced defendant to two consecutive terms of 282 to 348 months imprisonment for the two attempted first-degree murder convictions, a consecutive term of 133 to 169 months imprisonment for the robbery with a dangerous weapon conviction, and a consecutive term of 15 to 18 months imprisonment for the larceny of a motor vehicle conviction. Defendant gave notice of appeal in open court. On appeal, defendant contends that (1) the trial court erred by not granting defendant's motion to dismiss the charges of attempted first-degree murder for insufficiency of the evidence; (2) the trial court erred and committed an abuse of discretion by permitting the State to make improper remarks during its closing arguments; and (3) the trial court did not have jurisdiction and the indictments charging defendant with attempted first-degree murder did not sufficiently allege the elements of the offense.

## II. Sufficiency of the evidence

[1] Defendant contends that the trial court erred in not granting his motion to dismiss the charges for attempted first-degree murder as the State did not present sufficient evidence of his intent to kill in violation of his "state and federal rights."[1] Defendant further contends that the evidence when viewed in its totality showed that he "did not intend to kill [the victims]."

---

1. It is unclear whether defendant is making a constitutional argument by stating the trial court violated his "state and federal rights." In any event, we note that defendant did not properly preserve any constitutional challenge to the trial court's ruling on his motion to dismiss by raising this issue at trial, *see State v. Gainey*, 355 N.C. 73, 87, 558 S.E.2d 463, 473 ("Constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal."), *cert. denied*, 537 U.S. 896, 154 L. Ed. 2d 165 (2002).

The standard of review for a motion to dismiss is well known. A defendant's motion to dismiss should be denied if there is substantial evidence of: (1) each essential element of the offense charged, and (2) of defendant's being the perpetrator of the charged offense. Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. The Court must consider the evidence in the light most favorable to the State and the State is entitled to every reasonable inference to be drawn from that evidence. Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve.

*State v. Johnson*, ___ N.C. App. ___, ___, 693 S.E.2d 145, 148 (2010) (citations and quotation marks omitted). Our Supreme Court has further noted that

"Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988). If the evidence presented is circumstantial, the court must consider whether a reasonable inference of defendant's guilt may be drawn from the circumstances. Once the court decides that a reasonable inference of defendant's guilt may be drawn from the circumstances, then " 'it is for the jury to decide whether the facts, *taken singly or in combination*, satisfy [it] beyond a reasonable doubt that the defendant is actually guilty.' " *State v. Thomas*, 296 N.C. 236, 244, 250 S.E.2d 204, 209 (1978) (alteration in original) (quoting *State v. Rowland*, 263 N.C. 353, 358, 139 S.E.2d 661, 665 (1965)).

[*State v. Barnes*, 334 N.C. 67, 75-76, 430 S.E.2d 913, 918-19 (1993)]. "Both competent and incompetent evidence must be considered." *State v. Lyons*, 340 N.C. 646, 658, 459 S.E.2d 770, 776 (1995). . . . When ruling on a motion to dismiss, the trial court should be concerned only about whether the evidence is sufficient for jury consideration, not about the weight of the evidence. *See id.* at 67, 296 S.E.2d at 652.

*State v. Fritsch*, 351 N.C. 373, 379, 526 S.E.2d 451, 455-56, *cert. denied*, 531 U.S. 890, 148 L. Ed. 2d 150 (2000). "The elements of attempted first-degree murder are: (1) a specific intent to kill another; (2) an overt act calculated to carry out that intent, which goes beyond mere preparation; (3) malice, premeditation, and deliberation accompanying the act; and (4) failure to complete the intended killing." *State v.*

*Tirado*, 358 N.C. 551, 579, 599 S.E.2d 515, 534 (2004), *cert. denied*, 544 U.S. 909, 161 L. Ed. 2d 285 (2005). Our Supreme Court has stated that

> "Specific intent to kill is an essential element of first degree murder, but it is also a necessary constituent of the elements of premeditation and deliberation." *State v. Jones*, 303 N.C. 500, 505, 279 S.E.2d 835, 838-39 (1981). "Thus, proof of premeditation and deliberation is also proof of intent to kill." *Id.* at 505, 279 S.E.2d at 838-39.

*State v. Chapman*, 359 N.C. 328, 374, 611 S.E.2d 794, 827 (2005). This Court has noted that

> " 'An intent to kill is a mental attitude, and ordinarily it must be proved, if proven at all, by circumstantial evidence, that is, by proving facts from which the fact sought to be proven may be reasonably inferred.' " *State v. Ferguson*, 261 N.C. 558, 561, 135 S.E.2d 626, 629 (1964) (quoting *State v. Cauley*, 244 N.C. 701, 708, 94 S.E.2d 915, 921 (1956)). "The nature of the assault, the manner in which it was made, the weapon, if any, used, and the surrounding circumstances are all matters from which an intent to kill may be inferred." *State v. White*, 307 N.C. 42, 49, 296 S.E.2d 267, 271 (1982).

*State v. Poag*, 159 N.C. App. 312, 318, 583 S.E.2d 661, 666-67, *appeal dismissed and disc. review denied*, 357 N.C. 661, 590 S.E.2d 857 (2003). Similarly,

> [p]remeditation and deliberation are "processes of the mind" which are generally proved by circumstantial evidence. [*State v. Smith*, 357 N.C. 604, 616, 588 S.E.2d 453, 461 (2003), *cert. denied*, 542 U.S. 941, 159 L.Ed. 2d 819 (2004)]. " 'Premeditation means that [the] defendant formed the specific intent to kill the victim for some length of time, however short, before the actual killing.' " [*State v. Cagle*, 346 N.C. 497, 508, 488 S.E.2d 535, 543 (1997) (quoting *State v. Arrington*, 336 N.C. 592, 594, 444 S.E.2d 418, 419 (1994)), *cert. denied*, 522 U.S. 1032, 139 L.Ed. 2d 614 (1997)] (alteration in original). " 'Deliberation' means that the defendant formed the intent to kill in a cool state of blood and not as a result of a violent passion due to sufficient provocation." *State v. Truesdale*, 340 N.C. 229, 234, 456 S.E.2d 299, 302 (1995).

*Chapman*, 359 N.C. at 374, 611 S.E.2d at 827. In the context of attempted first-degree murder, an intent to kill and the existence of malice, premeditation, and deliberation may be inferred from cir-

cumstances including: (1) lack of provocation by the intended victims; (2) conduct and statements of the defendant both before and after the attempted killing; (3) threats made against the intended victims by the defendant; (4) animosity or previous difficulty between the defendant and the intended victims; and (5) the nature and manner of the attempted killing. *State v. Peoples*, 141 N.C. App. 115, 118, 539 S.E.2d 25, 28 (2000); *State v. Cozart*, 131 N.C. App. 199, 202, 505 S.E.2d 906, 909 (1998), *disc. review denied*, 350 N.C. 311, 534 S.E.2d 600 (1999).

Here, the direct evidence and reasonable inferences from the circumstantial evidence put forth by the State showed that defendant had an intent to kill as the day that defendant was told to leave the victims' residence by Jennifer Walker defendant drove to Walmart and bought a pair of binoculars and a knife; eventually returned to the victims' residence; laid near the residence watching them with his binoculars; when Maranda and the victims went to bed, he entered the residence and cut both of the victims multiple times in the neck while they were asleep. The evidence further showed that the Myers did not provoke defendant as they made no threats or actions against defendant. Wanda testified that they were not trying to keep Maranda from defendant, but that they did not want defendant around because they did not trust him and Maranda was free to leave at any time. Even though defendant felt that the Myers were keeping him from Maranda, Maranda did not want to leave with defendant as she was almost nine months pregnant and defendant had no place for them to live. As to "animosity or previous difficulty between the defendant and the intended victims" and "conduct and statements of the defendant both before and after the attempted killing" *see id.*, the evidence showed that defendant became increasingly angry at Wanda and Burke for not permitting him to visit Maranda at their home, as he told Jennifer Walker, after she told him to leave, that "he had a right to be there" because Maranda was his wife and he then "got in the car and spun out of the driveway." As to "threats made against the intended victims by the defendant" and defendant's conduct and statements after his actions, defendant told Maranda "if [she] didn't tell him the truth he was gonna kill [her], too[,]" and later told them "he was gonna kill [them] all." Also defendant ordered Wanda and Burke to get into the bathtub, telling them, "I should have just finished what I started." As to "the nature and manner of the attempted killing" evidence was presented that defendant used a knife to make multiple deep cuts to the victims' necks while they were asleep, which required numerous stitches to repair, and cut Burke from his

ear to the corner of his mouth, severing a main artery and causing excessive bleeding. Defendant also prevented Wanda and Burke from seeking medical treatment for approximately 45 minutes while they bled severely from their wounds. Therefore, "consider[ing] the evidence in the light most favorable to the State" and giving "the State . . . every reasonable inference to be drawn from that evidence" *see Johnson*, ___ N.C. App. at ___, 693 S.E.2d at 148, we hold that there was more than sufficient evidence of defendant's intent to kill the victims to permit both counts of attempted murder to be presented to a jury. *See Fritsch*, 351 N.C. at 379, 526 S.E.2d at 455-56. As defendant makes no further challenges to any of the other elements of attempted first-degree murder or any of his other convictions, we need not address those issues. Accordingly, defendant's argument is overruled.

## III. Closing arguments

[2] Defendant next contends that "the trial court committed error and abused its discretion in failing to intervene during the State's closing argument when the State made improper remarks that exceeded the scope of fair comment on the law[.]" In making his argument, defendant points us to the following portion of the State's closing statements:

> There are three kinds of people in the world: there are sheep, there are sheepdogs, and there are predators.
>
> Everybody in the normal course of business is what we consider a sheep. Sheep don't hurt each other, they don't do anything intentional, they just live their lives and they go on about their business. That's what Wanda and Burke Myers are. They're just trying to live their lives.
>
> Predators are the ones who come in the middle of the night and they slit your throats and they try to kill you because they want what they want, and they want what you have, and they're upset because life hasn't treated them fairly. But that's no excuse for them to be a predator.
>
> Sheepdogs. Those are the people that protect the sheep. Those are the people who are willing to stand up and do what's right. They serve in law enforcement, they are firefighters, they are the people who protect our communities and our citizens from people like Charles Teague.

Ladies and gentlemen, each and every one of you, for the purposes of being here today, is now a sheepdog. And I submit to you that it is your duty to protect the community from people like Charles Teague by finding him guilty on each and every one of these charges. Thank you.

Defendant argues that his convictions should be vacated as the State referring to defendant as a "predator" who the community needed to be protected by the jury was an "appeal to the jury's passion or prejudice" and those statements "were so grossly improper they rendered the trial and convictions fundamentally unfair."

Our Supreme Court has stated

It is well settled in North Carolina that counsel is allowed wide latitude in the argument to the jury. *State v. Covington*, 290 N.C. 313, 226 S.E. 2d 629 (1976); *State v. Williams*, 276 N.C. 703, 174 S.E. 2d 503 (1970), *rev'd on other grounds*, 403 U.S. 948. Even so, counsel may not place before the jury incompetent and prejudicial matters by injecting his own knowledge, beliefs and personal opinions not supported by the evidence. *State v. Britt*, 288 N.C. 699, 220 S.E. 2d 283 (1975). The control of the arguments of counsel must be left largely to the discretion of the trial judge, *State v. Britt, supra; State v. Monk*, [286 N.C. 509, 212 S.E.2d 125 (1975)] and the appellate courts ordinarily will not review the exercise of the trial judge's discretion in this regard unless the impropriety of counsel's remarks is extreme and is clearly calculated to prejudice the jury in its deliberations. *State v. Taylor*, 289 N.C. 223, 221 S.E. 2d 359 (1976).

*State v. Johnson*, 298 N.C. 355, 368-69, 259 S.E.2d 752, 761 (1979). Defendant made no objection regarding the prosecutor's statements during or following the State's closing arguments. "Therefore, our review on appeal is limited to the question of whether the arguments of the prosecutor were so grossly improper as to require the trial court to intervene *ex mero motu*." *State v. Garner*, 340 N.C. 573, 597, 459 S.E.2d 718, 731 (1995) (citation omitted), *cert. denied*, 516 U.S. 1129, 133 L. Ed. 2d 872 (1996).

We further note that "the prosecutor has a duty to strenuously present the State's case and use every legitimate means to bring about a just conviction." *State v. Daniels*, 337 N.C. 243, 277, 446 S.E.2d 298, 319 (1994) (citations and quotation marks omitted), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995). "[P]articular prosecutorial arguments are not viewed in an isolated vacuum, but are considered in con-

text based upon the underlying facts and circumstances." *State v. Love*, 131 N.C. App. 350, 359, 507 S.E.2d 577, 583 (1998) (citation and quotation marks omitted), *aff'd per curiam*, 350 N.C. 586, 516 S.E.2d 382, *cert. denied*, 528 U.S. 944, 145 L. Ed. 2d 280 (1999).

As noted above the defendant was charged with two counts of attempted first-degree murder and in order to prove these charges the State had to put forth evidence showing that defendant had an intent to kill and the existence of malice, premeditation, and deliberation which could be inferred from circumstantial evidence. *See Peoples,* 141 N.C. App. at 118, 539 S.E.2d at 28; *Cozart,* 131 N.C. App. at 202, 505 S.E.2d at 909. As portions of the State's closing argument demonstrate, it was the State's position that, without provocation from the victims, defendant committed the act of cutting the victims' throats with the intent to kill, and with premeditation and deliberation. In making this argument the State pointed to evidence showing that defendant had purchased the knife and binoculars, drove back to the victims' residence and watched the residence using the binoculars until he saw that they had gone to bed, and then in the early hours of morning broke in and cut both of the victims' throats while they were asleep. Specifically, the State made the following arguments in its closing argument as to evidence presented and the elements of intent to kill, premeditation, and deliberation:

Premeditation means that he formed the intent to kill over some period of time, however short, before he acted. He formed the intent to kill when he strolled into the Wal-Mart like a big man, got out his wallet—as you saw on the video, got out his money and paid for the instrument of death and destruction.

That's when he had formed that intent. He knew what he was gonna do. He was gonna get these people back for treating him the way he thinks that they treated him.

Deliberation means that the defendant acted while he was in a cool state of mind. How cold can you be? You know? Who had a fair chance at even getting to him? Nobody. How cold is it that you go in while two people who have taken care of your wife, loved her, raised her, provided for her, and provided for your baby? How cold and deliberate is it that you go in and you look at them and you see them, they're helpless and defenseless and sleeping, nothing to aid them in the assault or to fend off their attacker, but you go in and you slit them from ear to ear? That's cold.

It was defendant's contention that he did not have the intent to kill the victims, as defense counsel argued in her closing: "if he had possessed the intent to kill them, there was nothing in the world stopping him from doing it. But he didn't do it because he did not have that intent." Instead, it was defense counsel's argument that, defendant's actions amount to "assault with a deadly weapon inflicting serious injury." As there were conflicting arguments and interpretations of the State's evidence as to whether defendant had the intent to kill and committed these acts with premedication and deliberation, the above disputed portions of the prosecutor's closing argument were made in furtherance of the State's duty to strenuously present its case. *See Daniels*, 337 N.C. at 277, 446 S.E.2d at 319. In using the analogy to argue that defendant committed these acts with the intent to kill, premeditation, and deliberation, the prosecutor compared the victims to sheep that did not provoke any attack or do "anything intentional" and defendant, as the predator who had a plan to "come in the middle of the night" and "try to kill" the victims. Similarly, in *State v. Oakes*, ___ N.C. App. ___, ___, 703 S.E.2d 476, 480-82, *appeal dismissed*, ___ N.C. ___, 709 S.E.2d 918, *disc. review denied*, ___ N.C. ___, 709 S.E.2d 920 (2011), the prosecutor, in "pursuing defendant's conviction for . . . first-degree murder" made an analogy in his closing arguments that like a "cheetah[]," "tiger[,]" or "black panther[]" and their prey, a "gazelle" or "deer[,]" defendant stalked, lay in wait, and ultimately attacked and killed the victim. This Court stated that "[w]e reiterate that comparisons between criminal defendants and animals are *strongly* disfavored, but we are convinced by the State's argument on appeal that the use of the analogy, in context, helps to explain the complex legal theory surrounding premeditation and deliberation[,]" and, after analyzing the State's evidence as to premeditation and deliberation, went on to hold that "the challenged portions of the prosecutor's remarks were not so grossly improper so as to warrant the trial court's intervention *ex mero motu*[.]" *Id.* at ___, 703 S.E.2d at 482 (emphasis in original). Likewise, here we also "reiterate that comparisons between criminal defendants and animals are *strongly* disfavored" *see id.*, but, as the State has a "wide latitude in jury argument[,]" *see Johnson*, 298 N.C. at 368, 259 S.E.2d at 761, hold that the State's closing argument did not rise to the level of being so "grossly improper as to require the trial court to intervene *ex mero motu*." *See Garner*, 340 N.C. at 597, 459 S.E.2d at 731. Accordingly, the trial court did not abuse its discretion in not interfering in the prosecutor's closing arguments and defendant's argument is overruled. *See Johnson*, 298 N.C. at 369, 259 S.E.2d at 761.

IV. Indictment

Finally, defendant argues that "the indictments purporting to charge [him] with attempted first-degree murder are fatally defective because they do not sufficiently allege the essential elements of the offense and the trial court did not have jurisdiction and committed error in not dismissing these charges in violation of [his] state and federal rights." However, defendant concedes that he "raises this issues in brief for preservation purposes so as not to be considered to have abandoned this claim" as he is "mindful that the Supreme Court has previously held this not to violate a defendant's constitutional protections" in *State v. Jones*, 359 N.C. 832, 838-39, 616 S.E.2d 496, 499-500 (2005), which held that the use of short-form indictment which does not "allege specific intent, premeditation, and deliberation" to charge the defendant with attempted first-degree murder did not violate his constitutional rights. We agree that *Jones* is controlling, defendant's indictments were not in error, and his argument is noted and overruled.

For the foregoing reasons, we find no error in defendant's trial.

NO ERROR.

Judges HUNTER, Robert C. and HUNTER, JR., Robert N. concur.