IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-344

No. COA20-520

Filed 20 July 2021

Durham County, No. 20 SPC 202

IN THE MATTER OF: C.G.

Appeal by Respondent from an Order entered 7 February 2020 by Judge Doretta Walker in Durham County District Court. Heard in the Court of Appeals 10 March 2021.

*Attorney General Joshua H. Stein, by Assistant Attorney General Erin E. McKee, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Katy Dickinson-Schultz, for respondent-appellant.*

HAMPSON, Judge.

## **Factual and Procedural Background**

Respondent-Appellant C.G. (Respondent) appeals from an Involuntary Commitment Order entered in Durham County District Court declaring Respondent mentally ill, a danger to self and others, and ordering Respondent be committed to an inpatient facility for thirty days. The Record reflects the following:

On 30 January 2020, Dr. Phillip Jones, with the Duke University Medical Center (Duke), signed an Affidavit and Petition for Involuntary Commitment stating Respondent: "presents [as] psychotic and disorganized . . . [Respondent's] ACTT team being unable to stabilize his psychosis in the outpatient treatment. He is so psychotic he is unable to effectively communicate his symptoms and appears to have been neglecting his own care." Dr. Jones also stated: "Per [Respondent's] ACTT he threw away his medications and has not been taking them. He needs hospitalization for safety and stabilization." This affidavit was filed on 31 January 2020 in the Durham County District Court and Dr. Jones submitted a First Examination for Involuntary Commitment report with the Affidavit. The report lists the exact same findings supporting commitment as the Affidavit. On 31 January, a Durham County magistrate issued a Findings and Custody Order finding Respondent was mentally ill and a danger to self or others. Respondent was subsequently delivered to Duke's 24-hour facility.

That same day, Dr. Miles Christensen, also with Duke, signed a 24-Hour Facility Exam for Involuntary Commitment report; the report was filed on 3 February 2020. In this report, Dr. Christensen concluded Respondent was mentally ill and a danger to self and others. In the description of findings supporting commitment, Dr. Christensen noted, when asked about his goals for hospitalization, Respondent replied: "I don't know, 30, 40, 50 pounds probably." Dr. Christensen stated

Respondent said he would like to gain weight while he was in the hospital. Dr. Christensen further noted: "Patient perseverates on being 'Blessed and highly favored' . . . Talks to other people in the room during interview . . . States 'gods people putting voices in my head' " and "[s]uddenly begins crying without any precipitant."

On 7 February 2020, the trial court heard Respondent's case pursuant to N.C. Gen. Stat. § 122C-268. At the outset, Respondent's counsel objected to the proceedings because there was no representative for the State present. Respondent's counsel stated, "the judge, on its own initiate---or volition, cannot conduct the business of the State and these proceedings to move forward." The trial court responded:

> Because it sounds like the DA's office is refusing to do anything, and then it sounds like the Attorney General's office is refusing to do anything, and Duke and the VA are private and/or federal entities; therefore, they can't. So you're suggesting we do nothing and not have these cases at all as a result of people failing to do their duty? . . . I'm not gonna do that.

Respondent's counsel continued:

> Additionally, beyond that issue, I would argue that, in this case, the paperwork was also improper . . . based on 122C-281 and 285, in that while there is an allegation that [Respondent] is an individual with a mental illness and dangerous to himself, the description of findings in both the first examination and the examination done by the 24-hour facility does not allege facts that would be sufficient pursuant to the statute to--to meet those criteria and what is contained therein is more conclusory, and according to In Re: Reid and In Re: Ingram [phonetic spellings],

> the Court of Appeals has held that conclusory statements are not sufficient in the description of findings to proceed in that.

The trial court stated: "Okay. That's gonna be denied."

The hearing continued and the trial court asked if any witnesses were present in this case. The trial court called Dr. Max Schiff, also with Duke, to the witness stand. Respondent's counsel objected as Dr. Schiff was not the doctor who completed or signed either of the evaluation or reports in this case. The trial court overruled the objection and noted, "if [Dr. Schiff] doesn't know anything about this case, you can keep making your objection and we will go from there."

The trial court stated to Dr. Schiff: "you or someone in your organization has indicated that [Respondent] has a mental illness and is a danger to himself and others, and I will leave you to tell me whether or not you can give me enough evidence on this to go forward." Dr. Schiff responded: "So, yes. [Respondent] has a long-standing history of mental illness with psychosis. He currently carries a diagnosis of schizoaffective disorder, for which he's been treated since his late teens." Dr. Schiff continued to explain Respondent had been brought to Duke by "his ACT team" because of "an acute change in his mental status with increasing disorganization, hallucinations, delusions, abnormal psychomotor behavior, wandering around the streets" and because "he had not been taking his medications and had thrown them away[.]"

¶ 8        Dr. Schiff also stated: "On my evaluation . . . [Respondent] continued to demonstrate very profound disorganization of thought and behavior responding to hallucinations or internal stimuli"; that it was "very difficult to elucidate a narrative from [Respondent]"; and that Respondent was "reporting that thoughts were being inserted into his head and occasionally controlling him, as well as containing derogatory content that was quite disturbing to him."  The trial court interjected: "I'm sorry.  Say -- I didn't quite get the last thing you said.  You said some kind of behavior and then you said disturbing?"  Dr. Schiff clarified that Respondent heard voices in his head and that some of the content was derogatory and disturbing to Respondent. Dr. Schiff testified Respondent was compliant with treatment while at Duke but that "[Respondent] has stated he does not feel that he really needs the medication, nor does he have a long-standing issue."  Dr. Schiff continued: "Although he is accepting of help and has improved," Dr. Schiff was "still concerned that, if he were to be discharged, that there would be an immediate decompensation, given his . . . hallucinations which are disturbing and to him and, in the past, have led him to have aggressive behaviors in the community."

¶ 9        After questioning by the trial court, Respondent's counsel questioned Dr. Schiff.  When Respondent's counsel asserted Dr. Schiff was not the doctor who completed Respondent's first examination, Dr. Schiff responded that he was not but that he was present for the second examination and was Respondent's attending

physician since the second examination. Respondent's counsel asked Dr. Schiff if Respondent had an "ACT team" that was able to assist Respondent when he was not in the hospital. Dr. Schiff replied: "That's right . . . but they felt that . . . they could no longer support him in the community based on his level of disorganization and decompensation[.]" Dr. Schiff testified that he was not aware of any prior suicide attempts by Respondent, but that Respondent had exhibited "aggressive behavior" and been subject to assaults in the past. Dr. Schiff further testified Respondent had improved and was taking his medication while at Duke, but Dr. Schiff was concerned Respondent would decompensate if discharged especially because Respondent's ACT team—who would normally encourage Respondent to take his medication—felt it could not support Respondent in the community.

¶ 10        After Dr. Schiff testified, Respondent took the stand. Counsel asked Respondent with whom Respondent lived. Respondent replied: "My brother and my friend. My -- he's my brother first, but he's my friend second. . . . And his best friend, which is my roommate, which is my brother." Respondent also testified that he had previously "gotten into it" with a man named William on the street when William became angry. Respondent stated he thought William had an anger management problem. However, Respondent said he had never thought of harming William. Respondent stated he had been taking his medication and would continue to do so if discharged, but that he could not "tell the difference" when asked if he thought the

medication was helping him. Respondent also stated that his ACT team and Easterseals could provide him assistance if discharged, but that his ACT team wanted him to "take care of [his] teeth more," and Respondent "just disregarded it." Respondent also testified he did not eat "three meals a day," but that "they have started to give me at least breakfast" and he was "gonna have to eat more." When counsel asked Respondent if he would like to be released from Duke, he replied: "I see her ankles and Amy -- the Amy at Williams Ward -- Williams Ward remind me of my mom's ankles, and she takes her water pills in the morning. I remind her." Counsel then asked if Respondent was okay.

¶ 11        After questioning by Respondent's counsel, the trial court asked Respondent: "Your ACT team, tell me about what they do to help you." Respondent testified he would see his ACT team on Monday, Wednesday, and Thursday and that Fridays were for group substance abuse meetings. Respondent stated he went to group sessions "once in a blue" and that he received a bus ticket every time he went. He also stated Easterseals gave him weekly checks that he used to buy groceries. The trial court asked: "So right before they took you to the hospital, what was going on?" Respondent said, "I don't . . . everything was the same, you know?" When the trial court asked "[s]o you don't know why they took you there?" Respondent replied, "No, not really. I'm just there to eat and drink." The trial court asked Respondent about the hallucinations Dr. Schiff said Respondent had experienced; Respondent replied:

"I see angels, white dots." The trial court asked: "You see angels?" Respondent explained he saw white dots and black dots floating in the air. The trial court asked how the angels made Respondent feel. Respondent replied he knew the white dots were angels and that the black dots might be hallucinations or "negativity."

The trial court asked Respondent if he felt better when he was in the hospital or when he was not. Respondent replied that he had "bad habits." The trial court asked Respondent to tell the trial court about his bad habits. Respondent stated he smoked cigarettes and marijuana. Respondent continued:

> I pick up Black & Mild filters that's wooden. . . . I clean up cigarette butts. I have picked up a piece of glass . . . in our apartment that was right there in the corner near our trash can, but I didn't vacuum the floor over there in that area. I try.

The trial court asked: "You try?" Respondent replied: "Yes."

After Respondent's counsel gave closing arguments, the trial court found "by clear, cogent, and convincing evidence that the Defendant, in fact, has a mental issue of illness that is schizoaffective disorder and has a long-standing history of mental illness since his late teens." The trial court further found Respondent: suffered from hallucinations and disorganized thoughts; was "noncompliant with his medication when" not in the hospital; and was a danger to himself and others due to his active psychosis. The trial court continued: "[Respondent's] ACT team initially had him committed, as they are unable to see to his needs" and that "[Respondent] was unable

to sufficiently care for his needs, that being dental and his nourishment needs." Moreover, the trial court found, "[Respondent] has, in fact become a victim of assaultive behavior and disturbing thoughts, which caused deterioration and leaves him unable to perceive dangers to himself[.]" Accordingly, the trial court ordered Respondent be committed for an additional thirty days. Respondent's counsel gave oral Notice of Appeal in open court.

¶ 14        That same day, the trial court entered its written Order. The trial court checked a box incorporating the examination reports signed by Dr. Jones and Dr. Christensen as Findings of Fact supported by clear, cogent, and convincing evidence. The trial court found by clear, cogent, and convincing evidence the following additional Findings of Fact: Respondent had long-standing mental illness dating back to his teens; Respondent suffered from hallucinations; Respondent did not take his medication when he was not hospitalized; Respondent's psychosis caused him to be a danger to himself; Respondent's ACT team was "unable to sufficiently take care" of Respondent's dental and nourishment needs; and Respondent had been the victim of assaults and disturbing thoughts "which cause deterioration and leaves [Respondent] unable to perceive dangers to himself[.]" Accordingly, the trial court concluded Respondent was mentally ill and was dangerous to himself and to others. Consequently, the trial court ordered Respondent committed for thirty days.

**Issues**

The issues on appeal are: (I) whether this Court should exercise its discretion and allow Respondent's appeal when Respondent's counsel did not file a written notice of appeal as required by our Rules of Appellate Procedure; (II) whether the trial court violated Respondent's due process right to an impartial tribunal by calling and examining a witness in order to elicit evidence, in the absence of any representative of the State; and (III) whether the trial court erred in incorporating examination reports as Findings of Fact when the reports were not formally admitted into evidence and trial, and whether, absent those reports, the trial court's underlying Findings of Fact were supported by competent evidence and, in turn, supported its ultimate Findings Respondent was dangerous to himself and to others.

**Analysis**

I. Jurisdiction

Recognizing Respondent's trial counsel never filed a written Notice of Appeal, Respondent's appellate counsel has filed, concurrently with Respondent's brief, a Petition for Writ of Certiorari with this Court to allow review of the trial court's Order.

Respondents in involuntary commitment actions have a statutory right to appeal a trial court's order. N.C. Gen. Stat. § 122C-272 (2019) ("Judgment of the district court [in involuntary commitment cases] is final. Appeal may be had to the Court of Appeals by the State or by any party on the record as in civil cases."). Rule

3 of our Rules of Appellate Procedure governs such appeals. N.C.R. App. P. 3(a) (2021) ("Any party entitled to appeal from a judgment or order of a superior or district court rendered in a civil action or special proceeding may take appeal by filing notice of appeal with the clerk of superior court[.]"). Rule 3 requires parties to file written notice of appeal thirty days after the entry of such a judgment or order. N.C.R. App. P. 3(a), (c) (2021). "Rule 3 is a jurisdictional rule" and "a party's compliance with Rule 3 is necessary to establish appellate jurisdiction[.]" *Am. Mech., Inc. v. Bostic*, 245 N.C. App. 133, 143, 782 S.E.2d 344, 350 (2016). "[A] jurisdictional rule violation . . . precludes the appellate court from acting in any manner other than to dismiss the appeal." *Id.* at 142, 782 S.E.2d at 350 (citation and quotation marks omitted). Thus, in the absence of a properly filed notice of appeal, this Court has no jurisdiction to consider Respondent's appeal as of right.

¶ 18   However, Rule 21 of our Rules of Appellate Procedure provides: "[t]he writ of certiorari may be issued in appropriate circumstances by either appellate court to permit review of the judgments and orders of trial tribunals when the right to prosecute an appeal has been lost by failure to take timely action[.]" N.C.R. App. P. 21(a)(1) (2021); *see also* N.C. Gen. Stat. § 7A-32(c) (2019). Respondent concedes his counsel did not file written notice of appeal, but, because counsel objected to the proceedings and gave oral Notice of Appeal in open court, asks this Court to exercise its discretion and issue a writ of certiorari to review his case. Because Respondent's

counsel objected to the proceedings and demonstrated at least the intent to appeal the trial court's order, and because involuntary commitment is a significant incursion to one's liberty interests, *Humphrey v. Cady*, 405 U.S. 504, 509, 31 L. Ed. 2d 394 (1972), we grant Respondent's Petition and review the trial court's Order.

¶ 19 Additionally, although neither party argues this case is moot because the period of commitment has expired, discharge from involuntary commitment does not render an appeal moot. "The possibility that respondent's commitment in this case might likewise form the basis for a future commitment, along with other obvious collateral legal consequences, convinces us that this appeal is not moot." *In re Moore*, 234 N.C. App. 37, 41, 758 S.E.2d 33, 36 (2014) (citation and quotation marks omitted). Accordingly, Respondent's appeal is properly before this Court.

## II. Impartial Tribunal

¶ 20 Respondent argues the trial court violated his due process right to an impartial tribunal because the State was not represented by counsel and the trial court elicited evidence in favor of committing Respondent. The due process right to an impartial tribunal raises questions of constitutional law that we review de novo. *Dorsey v. UNC-Wilmington*, 122 N.C. App. 58, 66, 468 S.E.2d 557, 562 (1996). "In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the

context." N.C.R. App. P. Rule 10(a)(1) (2021). Although Respondent's counsel did not expressly state an objection on constitutional grounds, it is apparent from the context Respondent objected on due process grounds as counsel objected to the nature of the proceedings where there was no counsel for the State present and where the trial court was the only entity to elicit evidence on direct examination.

¶ 21 N.C. Gen. Stat. § 122C-268 provides for how both a respondent and the State are to be represented in an involuntary commitment proceeding. N.C. Gen. Stat. § 122C-268(d) mandates a "respondent shall be represented by counsel of his choice; or if he is indigent within the meaning of G.S. 7A-450 or refuses to retain counsel if financially able to do so, he shall be represented by counsel appointed in accordance with rules adopted by the Office of Indigent Defense Services." N.C. Gen. Stat. § 122C-268(d) (2019). As to representation of the State's interests, the statute has separate provisions depending on whether the proceeding arises out of a state facility or not:

> The attorney, who is a member of the staff of the Attorney General assigned to one of the State's facilities for the mentally ill or the psychiatric service of the University of North Carolina Hospitals at Chapel Hill, shall represent the State's interest at commitment hearings, rehearings, and supplemental hearings held for respondents admitted pursuant to this Part or G.S. 15A-1321 at the facility to which he is assigned.

> In addition, the Attorney General may, in his discretion, designate an attorney who is a member of his staff to represent the State's interest at any commitment hearing, rehearing, or

supplemental hearing held in a place other than at one of the State's facilities for the mentally ill or the psychiatric service of the University of North Carolina Hospitals at Chapel Hill.

N.C. Gen. Stat. § 122C-268(b) (2019).[1]

¶ 22        The State takes the position that the latter provision means the Attorney General has complete discretion whether or not to appear in involuntary commitment proceedings at non-state-owned facilities and, thus, involuntary commitment proceedings at private hospitals may proceed without the State's interests being represented, as occurred in this case. We express no opinion on the correctness of the State's statutory interpretation or as to the soundness of such practice. However, our Court has previously rejected arguments respondent's due process rights were violated in involuntary commitment proceedings where the State, as petitioner, was not represented by counsel and where:

> [t]he gravamen of [respondent's] contention is (1) that he was denied a fair hearing because, due to absence of counsel for petitioner, the court acted as petitioner's de facto counsel; and (2) that he was denied equal protection of the law because petitioners in hearings at state regional psychiatric facilities are represented by counsel, G.S. 122-58.7(b), -58.24, while petitioners in hearings held elsewhere are not.

---

[1] In addition: "If the respondent's custody order indicates that he was charged with a violent crime, including a crime involving an assault with a deadly weapon, and that he was found incapable of proceeding, the clerk shall give notice of the time and place of the hearing as provided in G.S. 122C-264(d). The district attorney in the county in which the respondent was found incapable of proceeding may represent the State's interest at the hearing." N.C. Gen. Stat. § 122C-268(c) (2019).

*In re Perkins*, 60 N.C. App. 592, 594, 299 S.E.2d 675, 677 (1983). There, this Court noted: "We are aware of no *per se* constitutional right to opposing counsel. Nothing in the record indicates language or conduct by the court which conceivably could be construed as advocacy in relation to petitioner or as adversative in relation to respondent." *Id.* We reached the same conclusion in a companion case filed the same day as *Perkins*, rejecting the argument "it is unconstitutional to allow the trial judge to preside at an involuntary commitment hearing and also question witnesses at the same proceeding." *In re Jackson*, 60 N.C. App. 581, 584, 299 S.E.2d 677, 679 (1983). Therefore, because our Court has previously upheld involuntary commitments where the State has not appeared and where the trial court has questioned witnesses and elicited evidence, we are bound by our prior precedent to conclude the same. *See In re Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) ("Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court.").

¶ 23        Moreover, "[j]udges do not preside over the courts as moderators, but as essential and active factors or agencies in the due and orderly administration of justice. It is entirely proper, and sometimes necessary, that they ask questions of a witness[.]" *State v. Hunt*, 297 N.C. 258, 263, 254 S.E.2d 591, 596 (1979) (citation and quotation marks omitted). However, trial courts must be careful to avoid prejudice

to the parties and may not impeach a witness's credibility. *State v. Howard*, 15 N.C. App. 148, 150-51, 189 S.E.2d 515, 517 (1972) (citation omitted).[2]

In this case, as in *Perkins*, the Record does not evince language or conduct by the trial court that could be construed as advocacy for or against either petitioner or Respondent. Here, the trial court called Dr. Schiff to testify. The trial court's only questions of Dr. Schiff on direct examination were: "you or someone in your organization has indicated that [Respondent] has a mental illness and is a danger to himself and others, and I will leave you to tell me whether or not you can give me enough evidence on this to go forward[;]" and "I'm sorry. Say -- I didn't quite get the last thing you said. You said some kind of behavior and then you said disturbing?"

The trial court asked Respondent: "Your ACT team, tell me about what they do to help you[;]" "So right before they took you to the hospital, what was going on?";

---

[2] We note that, although involuntary commitment cases involve significant curtailment of individual liberty interests, these proceedings are not adversarial in the respect that the State seeks to convict and incarcerate a respondent for allegedly violating the criminal code. Rather, these proceedings are inquisitorial as to whether a respondent is a danger to self or to others. *Cf. Ramirez-Barker v. Barker*, 107 N.C. App. 71, 78, 418 S.E.2d 675, 679 (1992) ("However, there is no burden of proof on either party on the 'best interest' [of a child in child custody cases] question. Although the parties have an obligation to provide the court with any pertinent evidence relating to the 'best interest' question, the trial court has the ultimate responsibility of requiring production of any evidence that may be competent and relevant on the issue. The 'best interest' question is thus more inquisitorial in nature than adversarial. (citation omitted)). As such, even though the trial court—at least initially— elicits a petitioner's evidence, and, thus, facilitates a petitioner's case at the outset, a trial court that maintains objectivity and does not prejudice either party does not advocate for a petitioner in an adversarial manner.

"[s]o you don't know why they took you there?"; whether Respondent experienced hallucinations and saw angels; whether Respondent felt better when he was in the hospital or in the community; and "tell me about [Respondent's bad habits]." As such, the trial court only elicited evidence that would otherwise be overlooked as no counsel for the State was present. The trial court did not ask questions meant to prejudice either party or impeach any witness. Accordingly, the trial court did not violate Respondent's right to an impartial tribunal.

### III. Findings of Fact

Respondent also argues the trial court violated his confrontation rights by incorporating examination reports signed by Dr. Jones and Dr. Christensen in its Findings of Fact when the trial court did not admit the reports into evidence and where Dr. Jones and Dr. Christensen were not present to testify at the hearing. Consequently, according to Respondent, the trial court's underlying Findings were insufficient to support its ultimate Findings Respondent was a danger to himself and to others.

*A. Confrontation*

"Certified copies of reports and findings of commitment examiners and previous and current medical records are admissible in evidence, but the respondent's right to confront and cross-examine witnesses may not be denied." N.C. Gen. Stat. § 122C-268(f) (2019). The Record does not indicate the reports were ever formally

introduced at the hearing. As such, Respondent claims he never had a chance to properly object to their admission or confront the reports or the doctors who signed them, and the State argues Respondent waived his confrontation rights because he failed to object during the hearing.

¶ 28 Although the trial court never formally admitted the reports into evidence and, thus, Respondent did not object to the reports' admission, the Record reflects Respondent's counsel did object to the reports as insufficient bases for Respondent's initial commitment. Moreover, Respondent's counsel objected to Dr. Schiff testifying because he was not the doctor who completed and signed the examination reports. The trial court overruled the objection stating, "if he doesn't know anything about this case, you can keep making your objection and we will go from there." Because Respondent asserted his right to confront Dr. Jones and Dr. Christensen, as the doctors who completed and signed the examination reports, Respondent did not waive his confrontation rights. *See In re J.C.D.*, 265 N.C. App. 441, 446, 828 S.E.2d 186, 190 (2019) ("Since respondent did not object to admission of the report, and she did not assert her right to have Dr. Ijaz appear to testify, the trial court did not err by admitting and considering the report."). Therefore, the trial court erred by incorporating the reports as Findings of Fact in its Order.

¶ 29 However, even absent the reports, Dr. Schiff's testimony and the trial court's Findings were sufficient to support the trial court's Order. *See In re Benton*, 26 N.C.

App. 294, 296, 215 S.E.2d 792, 793 (1975) (reversing the trial court's order where the doctor, who signed an affidavit incorporated by the trial court, was not present to testify because "[n]o evidence, except for the [improperly admitted] affidavit, was adduced to show that the respondent was imminently dangerous to herself or others."). Consequently, here, the trial court's error was harmless. *See State v. Ferguson*, 145 N.C. App. 302, 307, 549 S.E.2d 889, 893 (2001) ("Evidentiary errors are harmless unless a defendant proves that absent the error a different result would have been reached at trial.").

### B. Sufficiency of the Evidence

¶ 30 "To support an inpatient commitment order, the court shall find by clear, cogent, and convincing evidence that the respondent is mentally ill and dangerous to self, . . . or dangerous to others . . . ." N.C. Gen. Stat. § 122C-268(j) (2019). Our General Statutes define dangerous to self and others as:

> a. Dangerous to self.—Within the relevant past, the individual has done any of the following:
>
> 1. The individual has acted in such a way as to show all of the following:
>
> I. The individual would be unable, without care, supervision, and the continued assistance of others not otherwise available, to exercise self-control, judgment, and discretion in the conduct of the individual's daily responsibilities and social relations, or to satisfy the individual's need for nourishment, personal or medical care, shelter, or self-protection and safety.

II. There is a reasonable probability of the individual's suffering serious physical debilitation within the near future unless adequate treatment is given pursuant to this Chapter. A showing of behavior that is grossly irrational, of actions that the individual is unable to control, of behavior that is grossly inappropriate to the situation, or of other evidence of severely impaired insight and judgment shall create a prima facie inference that the individual is unable to care for himself or herself.

. . . .

b. Dangerous to others.—Within the relevant past, the individual has inflicted or attempted to inflict or threatened to inflict serious bodily harm on another, or has acted in such a way as to create a substantial risk of serious bodily harm to another, or has engaged in extreme destruction of property; and that there is a reasonable probability that this conduct will be repeated. Previous episodes of dangerousness to others, when applicable, may be considered when determining reasonable probability of future dangerous conduct. Clear, cogent, and convincing evidence that an individual has committed a homicide in the relevant past is prima facie evidence of dangerousness to others.

N.C. Gen. Stat. § 122C-3(11) (2019).

Thus, the trial court must satisfy two prongs when finding a respondent is a danger to self or others on any of the bases above: "A trial court's involuntary commitment of a person cannot be based solely on findings of the individual's 'history of mental illness or . . . behavior prior to and leading up to the commitment hearing,' but must [also] include findings of 'a reasonable probability' of some future harm absent treatment[.]" *In re J.P.S.*, 264 N.C. App. 58, 62, 823 S.E.2d 917, 921 (2019) (citing *In re Whatley*, 224 N.C. App. 267, 273, 736 S.E.2d 527, 531 (2012)). "Although

the trial court need not say the magic words 'reasonable probability of future harm,' it must draw a nexus between past conduct and future danger." *Id.* at 63, 823 S.E.2d at 921.

¶ 32 It is the role of the trial court to determine whether the evidence of a respondent's mental illness and danger to self or others rises to the level of clear, cogent, and convincing. *In re Whatley*, 224 N.C. App. at 270-71, 736 S.E.2d at 530 (citation omitted). "Findings of mental illness and dangerousness to self are ultimate findings of fact." *In re B.S.*, 270 N.C. App. 414, 417, 840 S.E.2d 308, 310 (2020) (citing *In re Collins*, 49 N.C. App. 243, 246, 271 S.E.2d 72, 74 (1980)). On appeal, "[t]his Court reviews an involuntary commitment order to determine whether the ultimate findings of fact are supported by the trial court's underlying findings of fact and whether those underlying findings, in turn, are supported by competent evidence." *B.S.*, 270 N.C. App. at 417, 840 S.E.2d at 310 (citing *In re W.R.D.*, 248 N.C. App. 512, 515, 790 S.E.2d 344, 347 (2016)). As such, the trial court must also record the facts that support its "ultimate findings[.]" *Whatley*, 224 N.C. App. at 271, 736 S.E.2d at 530. "If a respondent does not challenge a finding of fact, however, it is presumed to be supported by competent evidence and [is] binding on appeal." *Moore*, 234 N.C. App. at 43, 758 S.E.2d at 37 (citation and quotation marks omitted).

¶ 33 Here, Respondent does not challenge the trial court's ultimate Finding he was mentally ill. Respondent challenges the trial court's ultimate Findings he was a

danger to himself and to others. Because we conclude the trial court properly found Respondent was a danger to himself, we do not reach the issue of whether he was a danger to others.

¶ 34    As to whether Respondent was a danger to himself, Respondent challenges the trial court's underlying Findings Respondent could not "take care of his nourishment and dental needs" because, according to Respondent, these Findings were not supported by the testimony. However, the trial court heard testimony from Respondent that his ACT team wanted him to take better care of his teeth and that Respondent "disregarded" that advice. Respondent also told the trial court he needed to eat more, and that his ACT team was able to provide him "at least one meal" at breakfast. But, Dr. Schiff testified that Respondent's ACT team brought Respondent to Duke's attention because the team felt like it could no longer care for Respondent in the community. Therefore, there was some competent evidence as to Respondent's inability to care for his own nourishment and dental needs. It is the trial court's role, and not this Court's role, to determine whether this evidence rises to the level of clear, cogent, and convincing. *Whatley*, 224 N.C. App. at 270-71, 736 S.E.2d at 530. Thus, these underlying Findings satisfied the first prong requiring the trial court find Respondent was unable to care for himself.

¶ 35    The trial court's Finding Respondent's ACT team was unable to "sufficiently" care for Respondent's "dental and nourishment" needs also created the nexus between

Respondent's mental illness and future harm to himself. Accordingly, the trial court satisfied the requirement it find a reasonable probability of future harm absent treatment.

Moreover, the trial court heard testimony from Dr. Schiff that, while under Dr. Schiff's care, Respondent experienced hallucinations and stated "thoughts were being inserted to his head and occasionally control[ed] him." Dr. Schiff testified these hallucinations and disturbing thoughts had led to Respondent "wandering the streets" and being assaulted in the past and that Respondent would decompensate if discharged. Respondent confirmed he saw "angels" and "black dots" he thought were hallucinations. Dr. Schiff also testified Respondent said he did not need his medication and did not think he had a long-standing issue. "A showing of behavior that is grossly irrational, of actions that the individual is unable to control, . . . or of other evidence of severely impaired insight and judgment shall create a *prima facie inference* that the individual is unable to care for himself or herself." N.C. Gen. Stat. § 122C-3(11)(a)(1)(II) (2019) (emphasis added). Here, the trial court heard evidence of actions Respondent was unable to control and of Respondent's severely impaired insight as to his own condition. As such, the evidence supported the *prima facie* inference Respondent could not care for himself. Consequently, the trial court did not err in finding Respondent was a danger to himself.

## Conclusion

For the foregoing reasons, we affirm the trial court's Order.

AFFIRMED.

Judge DILLON concurs in a separate opinion.

Judge GRIFFIN dissents in a separate opinion.

No. COA20 – 520 *In re: C.G.*

DILLON, Judge, concurring.

I fully concur in the majority opinion and its reasoning. I write separately to expound on two issues.

I. Due Process Concerns

First, as noted in the majority opinion, the calling/questioning of Dr. Schiff by the trial court, where the State's interest was not represented at the hearing, was not a *per se* constitutional violation. An involuntary commitment hearing is civil in nature, the purpose of which is to determine whether an individual is a danger to self or others such that (s)he needs to be further evaluated/treated; the matter is not criminal in nature. The State typically does not instigate the process. Rather, the process is instigated by a concerned private citizen – typically a doctor or a guardian. And while the State has the right to have its interests represented at the hearing, the State is not required to have representation.

The individual respondent, whose liberty interests are at issue, has constitutional rights, such as to counsel, to present evidence, to cross-examine witnesses, and to an impartial judge; however, the individual does not have the constitutional right to have *the State's interests* represented at the hearing. As noted in the majority opinion, our Court has so held in the context of involuntary commitment hearings, and we are so bound to hold. *See, e.g., In re Perkins*, 60 N.C. App. 592, 594, 299 S.E.2d 675, 677 (1983).

¶ 41   It may be that the Attorney General's Office simply did not have the resources or the desire to appear. However, this decision does not divest the trial court from the ability to seek the truth concerning a petition, to determine whether a respondent is a danger to self or others.

¶ 42   Further, the respondent's constitutional rights are not violated simply because the trial court calls the person (typically the petitioner) who has appeared at the hearing and to question that witness, so long as the trial court remains impartial in its search for the truth. Indeed, our Rules of Evidence allow for the trial court to call witnesses and question them. N.C. Gen. Stat. § 8C-1, Rule 614(b) (2020). Our Supreme Court has described this principle, that "the trial judge may interrogate a witness for the purpose of developing a relevant fact . . . in order to ensure justice and aid [the fact-finder] in their search for a verdict that speaks the truth." *State v. Pearce*, 296 N.C. 281, 285, 250 S.E.2d 640, 644 (1979). That Court has further held that it is not a *per se* constitutional violation for the trial court to exercise its right to call or question witnesses. *State v. Quick*, 329 N.C. 1, 21-25, 405 S.E.2d 179, 192-93 (1991). And our Court has held that it is not *per se* prejudicial for a judge to question a witness, even where the answer provides the *sole proof* of an element which needs to be proved. *See State v. Lowe*, 60 N.C. App. 549, 552, 299 S.E.2d 466, 468 (1983); *see also State v. Stanfield*, 19 N.C. App. 622, 626, 199 S.E.2d 741, 744 (1973).

¶ 43        Other state courts held similarly. For instance, the Indiana Court of Appeals held that there was no violation of due process when the presiding judge called and questioned witnesses during an involuntary commitment hearing where the State was unrepresented. *In re Commitment of A.W.D.*, 861 N.E.2d 1260, 1264 (Ind. App. 2007).

¶ 44        A Florida appellate court has held that the calling and questioning of the witness by the judge due to the absence of any attorney representing the State's interest was harmless and that the respondent's constitutional rights were not violated based on the procedure. *Jordan v. State*, 597 So.2d 352, 353 (Fla. App. 1992). However, that same year, that same court – though recognizing *Jordan* as good law – held that the due process rights of another respondent were violated when the trial judge called and questioned the petitioning doctor. *Jones v. State*, 611 So.2d 577, 580-81 (Fla. App. 1992). The *Jones* court so held, though, *not* because the State was not represented at the hearing. Rather, the court so held because the treating doctor did not provide testimony sufficient to support the trial court's subsequent order for involuntary placement. *Id.* at 580. Perhaps the doctor would have provided sufficient testimony in that case had the State's attorney been present to ask more probing questions. But a trial court is more limited, from a due process perspective, in its questioning, as the judge may not appear to be advocating to reach a particular result.

II. Evidentiary Concerns

¶ 45          Second, I appreciate the dissent's concern regarding the trial court's incorporation of the reports of doctors who had examined Respondent in the past but who did not testify. However, all the evidence which the trial court relied on to make its ultimate findings was supported by the testimony of either Dr. Schiff, whom Respondent's counsel was allowed to cross-examine, or of Respondent himself. And, as noted by the majority, the trial court stated at the outset that it was concerned that any evidence supporting a commitment order needed to come from Dr. Schiff based on what he knew and not from the opinions of doctors who had drafted the reports based on their prior examinations. Dr. Schiff had conducted the most recent evaluation of Respondent and was the current doctor caring for him.

No. COA20-520 – *In re C.G.*

GRIFFIN, Judge, dissenting.

In this case, an individual was deprived of his liberty by an officer of the court who, after expressing some reluctance, offered and admitted evidence against that individual, called an adverse witness to testify on his adversary's behalf, and examined that witness to elicit the State's evidence. I therefore cannot conclude that Respondent received a full and fair hearing before a neutral officer of the court, as is his right under Article I, Section 19, of the North Carolina Constitution and the Fourteenth Amendment of the United States Constitution. Additionally, the majority holds that, although the trial court erred by incorporating into its findings of fact examination reports written by physicians who did not testify at the hearing, the trial court's error was harmless. I would hold that this assignment of error was not preserved for appellate review, as Respondent was deprived of the opportunity to object to the reports' admission, making preservation of this argument for appellate review impossible under N.C. R. App. P. 10(a)(1).

## I.   Analysis

Respondent argues that he was deprived of his right to an impartial tribunal because, in the absence of representation for the State, the trial judge impermissibly "present[ed] the State's evidence in support of [the State's] claim" and called and questioned the State's witness on its behalf. I agree.

The trial court violated Respondent's right to due process by (1) offering and admitting examination reports into evidence without the knowledge of Respondent

or his counsel; (2) depriving Respondent of his opportunity to object to the reports it offered and admitted; and (3) calling and examining the State's witness on the State's behalf. Each of these errors are discussed below in turn.

### A. Offering and Admitting the Examination Reports

¶ 49 "A judge's impartiality . . . implicates both federal and state constitutional due process principles." *State v. Oakes*, 209 N.C. App. 18, 29, 703 S.E.2d 476, 484 (2011) (citing *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)). The Fourteenth Amendment of the United States Constitution provides that no state "shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Law of the Land Clause contained in Article I, Section 19, of the North Carolina Constitution "guarantees to the litigant in every kind of judicial proceeding the right to an adequate and fair hearing before an impartial tribunal, where he may contest the claim set up against him, and . . . meet it on the law and the facts and show if he can that it is unfounded." *In re Edwards' Estate*, 234 N.C. 202, 204, 66 S.E.2d 675, 677 (1951) (citations omitted); *see also Rhyne v. K-Mart Corp.*, 358 N.C. 160, 180, 594 S.E.2d 1, 15 (2004) ("The term 'law of the land' as used in Article I, Section 19, of the Constitution of North Carolina, is synonymous with 'due process of law' as used in the Fourteenth Amendment to the Federal Constitution." (citation omitted)).

¶ 50 In cases where an individual's "claim or defense turns upon a factual adjudication," as here, "the constitutional right of the litigant to an adequate and fair

hearing *requires that he be apprised of all the evidence received by the court and given an opportunity to test, explain, or rebut it.*"  *In re Gupton*, 238 N.C. 303, 304-05, 77 S.E.2d 716, 717-18 (1953) (emphasis added) (citations omitted); *see also State v. Gordon*, 225 N.C. 241, 246, 34 S.E.2d 414, 416 (1945) ("'The basic elements' of a fair and full hearing on the facts 'include the right of each party to be apprised of all the evidence upon which a factual adjudication rests, plus the right to examine, explain or rebut all such evidence[.]'" (quoting *Carter v. Kubler*, 320 U.S. 243, 247 (1943))); *Biddix v. Rex Mills, Inc.*, 237 N.C. 660, 663, 75 S.E.2d 777, 780 (1953) ("In a judicial proceeding the determinative facts upon which the rights of the parties must be made to rest must be found from . . . evidence offered in open court . . . .  Recourse may not be had to records, files, or data not thus presented to the court for consideration."). Our Supreme Court has previously held that "manifestly there is no hearing in any real sense when the litigant does not know what evidence is received and considered by the court."  *Edwards' Estate*, 234 N.C. at 204, 66 S.E.2d at 677.

¶ 51        In this case, the trial court considered as evidence examination reports written by two physicians who did not testify at the hearing.  Critically, the trial court never offered the reports into evidence in open court, nor did it make any ruling on the reports' admissibility as evidence.  Respondent was thus not "apprised of all the evidence received by the court and given an opportunity to test, explain, or rebut it[,]" in accordance with his constitutional right to a full and fair hearing on the facts.

*Gupton*, 238 N.C. at 304-05, 77 S.E.2d at 717-18. Instead, the trial court unilaterally offered the reports as evidence in the State's stead, admitted them as evidence, and proceeded to incorporate the evidence into its findings of fact. All of this occurred without the knowledge of Respondent or his counsel. Such a practice cannot comport with the bedrock procedural safeguards demanded by our State and federal constitutions. It is a basic guarantee of due process that every litigant be informed of the evidence considered by the court. *In re Gibbons*, 245 N.C. 24, 29, 95 S.E.2d 85, 88 (1956) ("The basic and fundamental law of the land requires that parties litigant be given an opportunity to be present in court when evidence is offered in order that they may know what evidence has been offered[.]").

**B. Opportunity to Object**

¶ 52 Respondent was also deprived of an opportunity to object to the admission of the reports as required to preserve the issue of their admissibility for appellate review.

¶ 53 N.C. Gen. Stat. § 122C-268(f) provides that "[c]ertified copies of reports and findings of commitment examiners and previous and current medical records are admissible in evidence, but the respondent's right to confront and cross-examine witnesses may not be denied." N.C. Gen. Stat. § 122C-268(f) (2019). It follows that an examination report authored by a physician who does not appear to testify at trial is normally inadmissible as evidence. *In re Hogan*, 32 N.C. App. 429, 432-33, 232

S.E.2d 492, 494 (1977). However, this Court has held that a respondent must "object to admission of the report" or "assert her right to have [the physician who authored the report] appear to testify" at trial in order to preserve the issue of the report's admissibility for appellate review under N.C. R. App. P. 10(a)(1). *In re J.C.D.*, 265 N.C. App. 441, 446, 828 S.E.2d 186, 190 (2019).

¶ 54    As noted by the majority, "the trial court never formally admitted the reports into evidence and, thus, Respondent did not object to the reports' admission." Nonetheless, the majority holds that the issue of the reports' admissibility as evidence was adequately preserved by Respondent, reasoning that Respondent asserted his right to confront the two physicians who authored the reports:

> Respondent's counsel objected to Dr. Schiff testifying because he was not the doctor who completed and signed the examination reports. The trial court overruled the objection stating, "if he doesn't know anything about this case, you can keep making your objection and we will go from there." Because Respondent asserted his right to confront Dr. Jones and Dr. Christensen, as the doctors who completed and signed the examination reports, Respondent did not waive his confrontation rights. *See In re J.C.D.*, 265 N.C. App. 441, 446, 828 S.E.2d 186, 190 (2019) ("Since respondent did not object to admission of the report, and she did not assert her right to have Dr. Ijaz appear to testify, the trial court did not err by admitting and considering the report.").

¶ 55    The majority does not explain how Respondent managed to assert his right to confront Dr. Jones and Dr. Christensen by lodging an objection to the admissibility

of Dr. Schiff's testimony. Considering the context in which the objection was made, along with the trial court's ruling in response, Respondent's objection was clearly based on the grounds that Dr. Schiff lacked the personal knowledge necessary to provide admissible testimony. *See* N.C. Gen. Stat. § 8C-1, Rule 602 (2019) ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself."). The trial court made it clear that it understood this to be the grounds for Respondent's objection when it ruled on the objection, stating "if [Dr. Schiff] doesn't know anything about this case, you can keep making your objection and we will go from there." This ruling can hardly be interpreted as a ruling made in response to a party asserting his right to confront two witnesses who were not present at the hearing.

¶ 56    The majority also notes that "the Record reflects Respondent's counsel did object to the reports as insufficient bases for Respondent's initial commitment." This specific objection was directed at whether the reports were sufficient "to establish reasonable grounds for the issuance of [the original] custody order" by the magistrate. *See In re Reed*, 39 N.C. App. 227, 229, 249 S.E.2d 864, 866 (1978). Given that this objection was made on specific grounds wholly unrelated to the admissibility of the reports as evidence at the district court hearing or Respondent's right to confrontation, it cannot extend to preserve the issue at bar for appellate review. *See,*

*e.g.*, *Powell v. Omli*, 110 N.C. App. 336, 350, 429 S.E.2d 774, 780 (1993) ("A specific objection that is overruled is effective only to the extent of the grounds specified." (citation omitted)).

¶ 57      Respondent was deprived of his opportunity to object to the admissibility of the reports as evidence. I would therefore hold that his argument regarding the reports' admissibility is not preserved for appellate review under N.C. R. App. P. 10(a)(1). As discussed above, however, the trial court deprived Respondent of his constitutional right to an impartial tribunal by offering the reports into evidence, admitting them as evidence, and incorporating them into its findings of fact. The trial court also violated Respondent's right to due process by depriving him of his opportunity to object to the admissibility of the reports, and thus depriving him of the opportunity to have the question of the reports' admissibility reviewed on appeal.

## C. Calling and Examining the State's Witness

¶ 58      The trial court impermissibly assumed the role of Respondent's adversary by calling and examining the State's witness on the State's behalf. "A commitment order is essentially a judgment by which a person is deprived of his liberty, and as a result, he is entitled to the safeguard of a determination by a neutral officer of the court . . . just as he would be if he were to be deprived of liberty in a criminal context." *Reed*, 39 N.C. App. at 229, 249 S.E.2d at 866 (citation omitted). This Court has previously held that, because a commitment order involves a deprivation of liberty, a trial judge

may not "assume[] the role of prosecuting attorney [by] examining the State's witnesses" on its behalf during "juvenile proceedings that could lead to detention." *In re Thomas*, 45 N.C. App. 525, 526, 263 S.E.2d 355, 355 (1980).

¶ 59        This Court's decision in *Thomas* involved a juvenile proceeding in which the respondent was represented by counsel but where "[t]he State was not represented by the District Attorney or other counsel." *Id.* at 526, 263 S.E.2d at 355. In the absence of counsel for the State, "the trial judge examined all three witnesses" on the State's behalf. *Id.* Although the record on appeal did "not reveal that [the trial judge] asked leading questions or was otherwise unfair during the course of the hearing[,]" this Court held that the respondent's right to due process was violated because "the judge, at least technically, assumed the role of prosecuting attorney in examining the State's witnesses." *Id.*

¶ 60        Here, the trial judge similarly called and examined the State's witness on the State's behalf. The judge did not ask any "leading questions[,]" nor was she "otherwise unfair during the course of the hearing." *Id.* Nonetheless, as this Court reasoned in *Thomas*, the "dual role of judge and prosecutor" simply cannot "measure up to the essentials of due process and fair treatment" in a proceeding where an individual's physical liberty is at stake. *Id.* at 527, 263 S.E.2d at 356.

¶ 61        Although this Court's opinion in *Thomas* involved a civil commitment order in the context of juvenile proceedings, "as in both proceedings for juveniles and mentally

deficient persons [where] the state undertakes to act in *parens patriae*, it has the inescapable duty to vouchsafe due process[.]" *In re Watson*, 209 N.C. App. 507, 516, 706 S.E.2d 296, 302 (2011) (citations omitted). Moreover, "the Due Process Clause *requires the Government in a civil-commitment proceeding to demonstrate by clear and convincing evidence that the individual is mentally ill and dangerous.*" *U.S. v. Jones*, 463 U.S. 354, 362 (1983) (emphasis added) (citing *Addington v. Texas*, 441 U.S. 418, 426-27 (1979)); *Foucha v. Louisiana,* 504 U.S. 71, 76 (1992) ("[T]he State is required by the Due Process Clause to prove by clear and convincing evidence the . . . statutory preconditions to commitment[.]" (citation omitted)). The trial court thus cannot relieve the State of its burden of proof by calling the State's witnesses when the State fails to prosecute its case.[3]

---

[3] The majority contends that involuntary commitment proceedings are not "adversarial" but are instead "inquisitorial[,]" citing the "best interest" of a child in custody cases as analogous to the nature of the inquiry in involuntary commitment proceedings. However, caselaw clearly indicates that involuntary commitment proceedings are not only adversarial in nature but are necessarily so as a matter of due process. *See Vitek v. Jones*, 445 U.S. 480, 485, 495-97 (1980) (holding that, because individuals "facing involuntary [commitment] to a mental hospital are threatened with immediate deprivation of liberty . . . and because of the inherent risk of a mistaken [commitment], the District Court properly determined that" involuntary commitment "must be accompanied by adequate notice, *an adversary hearing before an independent decisionmaker*, a written statement by the factfinder of the evidence relied on and the reasons for the decision[,]" and independent assistance provided to the respondent by the State (emphasis added)); *Foucha*, 504 U.S. at 81 (holding that Louisiana's civil commitment statute did not comply with due process because, pursuant to the statute, the respondent was not "entitled to an adversary hearing at which the State must prove by clear and convincing evidence that he is demonstrably

The majority holds that "because our Court has previously upheld involuntary commitments where the State has not appeared and where the trial court has questioned witnesses and elicited evidence, we are bound by our prior precedent to

_____

dangerous to the community"); *Demore v. Kim*, 538 U.S. 510, 550 (2003) (Souter, J., concurring in part and dissenting in part) (noting that the Court in *Foucha* "held that Louisiana's civil commitment statute failed due process because the individual was denied an 'adversary hearing at which the State must prove by clear and convincing evidence that he is demonstrably dangerous to the community'" (quoting *Foucha*, 504 U.S. at 81)).

Moreover, unlike in involuntary commitment proceedings where "the State is required by the Due Process Clause to prove by clear and convincing evidence the . . . statutory preconditions to commitment[,]" *Foucha*, 504 U.S. at 75, "there is no burden of proof on either party" when determining the "best interest" of a child in custody cases. *Ramirez-Barker v. Barker*, 107 N.C. App. 71, 78, 418 S.E.2d 675, 679 (1992), *overruled on other grounds by Pulliam v. Smith*, 348 N.C. 616, 501 S.E.2d 898 (1998). This distinction is critical; "[i]n cases involving individual rights, whether criminal or civil, the standard of proof at a minimum reflects the value society places on individual liberty." *Addington*, 441 U.S. at 425 (1979). "The rule as to the burden of proof is important and indispensable in the administration of justice. It constitutes a substantial right of the party upon whose adversary the burden rests, and therefore it should be guarded carefully and rigidly enforced by the courts." *Skyland Hosiery Co. v. American Ry. Express Co.*, 184 N.C. 478, 480, 114 S.E. 823, 824 (1922).

It is clear that the State may only "confine a mentally ill person if it shows 'by clear and convincing evidence that the individual is mentally ill and dangerous[.]'" *Foucha*, 504 U.S. at 80. "Here, the State has not carried that burden." *Id*. The State's burden of proof does not suddenly vanish when the State fails to prosecute its case. *Id*. Instead, the burden must be assumed by either the trial court or the respondent, or the case must be dismissed. The trial court cannot simultaneously bear the incompatible burdens of neutrality and proof without depriving litigants of the right to due process. Indeed, the burden of proof is inherently adversarial and unneutral. *See Skyland Hosiery Co.*, 184 N.C. at 480, 114 S.E. 823, 824. The trial court therefore necessarily deprived Respondent of his right to an impartial tribunal by prosecuting the State's case in the State's absence. *See Upchurch v. Hudson Funeral Home, Inc.*, 263 N.C. 560, 567, 140 S.E.2d 17, 22 (1965) ("Every suitor is entitled by the law to have his cause considered with the cold neutrality of the impartial judge . . . . This right can neither be denied nor abridged." (citations and internal quotation marks omitted)).

conclude the same." In so holding, the majority relies exclusively on this Court's decisions in *In re Perkins*, 60 N.C. App. 592, 299 S.E.2d 675 (1983), and *In re Jackson*, 60 N.C. App. 581, 299 S.E.2d 677 (1983). Neither *Perkins* nor *Jackson* passed on the constitutional question we are being asked to decide. Both cases involved constitutional challenges to the involuntary commitment statutes. This Court disposed of both cases on the same grounds, holding that neither respondent could demonstrate standing sufficient to challenge the constitutionality of the statutes. *See Perkins*, 60 N.C. App. at 594, 299 S.E.2d at 677 (holding that the respondent failed "to show that he ha[d] been adversely affected by the involuntary commitment statutes as applied, and he therefore ha[d] no standing to challenge their constitutionality"); *Jackson*, 60 N.C. App. at 584, 299 S.E.2d at 679 ("A litigant who challenges a statute as unconstitutional must have standing. To have standing, he must be adversely affected by the statute. We find no prejudice to the respondent in the challenged portions of the statute. Thus, she has no standing to challenge their constitutionality." (citations omitted)).

¶ 63        The majority's reliance on *Perkins* and *Jackson* is misplaced for two reasons. First, "standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction[.]" *Willowmere Community Assoc., Inc. v. City of Charlotte*, 370 N.C. 553, 563, 809 S.E.2d 558, 560 (2018) (citations and quotation marks omitted). By holding that the respondents in *Perkins* and *Jackson* lacked standing to challenge

the involuntary commitment statutes, this Court declined to decide the underlying constitutional question in both cases. Accordingly, *Perkins* and *Jackson* cannot stand for the proposition that the trial court's conduct in this case complied with due process requirements.

¶ 64      Second, unlike in *Perkins* and *Jackson*, Respondent does not challenge the constitutionality of the involuntary commitment statutes as applied to him. He alleges that *the trial court* deprived him of his right to have his case decided by a neutral officer of the court when it presented the State's case in the State's absence. He does not argue that the involuntary commitment statutes unconstitutionally vest discretion in the State to either send a representative to pursue its interest in court or not. He argues that a trial judge's absolute duty of impartiality cannot be waived without depriving litigants of their right to due process. [4]

---

[4] Because Respondent does not raise a constitutional challenge to the involuntary commitment statutes on appeal, neither *Perkins* nor *Jackson* assists us in addressing the constitutional question raised by Respondent. For the same reason, the standing analyses in both cases are inapplicable in this case. Writing for our Supreme Court in *Committee to Elect Dan Forest v. Employees Political Action Committee*, 376 N.C. 558, 2021-NCSC-6, Justice Hudson delineated the key distinctions between the standing requirements under our State and federal constitutions. Among those distinctions is that, unlike the federal constitution, "the federal injury-in-fact requirement has no place in the text or history of our [State] Constitution" and is "inconsistent with the caselaw of this Court." *Id.* ¶¶ 73-74. "[A]s a rule of prudential self-restraint," however, our caselaw requires "a plaintiff to allege 'direct injury'" before a court can "invoke the judicial power to pass on the constitutionality of a legislative or executive act." *Id.* ¶ 73.

## D. Discretion of the Attorney General

The State argues on appeal that N.C. Gen. Stat. § 122C-268(b) "specif[ies] that the Attorney General has discretion on whether to send a member of his staff to a hearing outside a State facility for the mentally ill." Respondent does not challenge the Attorney General's statutory authority to choose not to send a representative to represent the State in involuntary commitment proceedings involving non-State facilities. Respondent alleges that the trial court deprived him of his right to an impartial tribunal by presenting the State's case in the State's absence.

Nonetheless, in evaluating the adequacy of procedural protections afforded to an individual in a government proceeding, the due process inquiry under the federal constitution considers "the Government's interest, including the function involved

---

In cases where an individual is not challenging the constitutionality of a statute, as here, our caselaw only requires that the individual allege a legal injury in order to establish standing: "When a person alleges the infringement of a legal right arising under a cause of action at common law, a statute, or the North Carolina Constitution, . . . *the legal injury itself gives rise to standing.*" *Id.* ¶ 82. (emphasis added). This is because the "remedy clause [of our State Constitution] should be understood as *guaranteeing* standing to sue in our courts where a legal right at common law, by statute, or arising under the North Carolina Constitution has been infringed." *Id.* ¶ 81 (emphasis in original) (citing N.C. Const. Art. I, § 18, cl. 2).

Here, Respondent alleges that he has the right pursuant to our State and federal constitutions to have his case decided by an impartial tribunal and that he was deprived of this right when the trial court prosecuted the State's case in the State's absence. Because Respondent does not challenge the involuntary commitment statutes as unconstitutional, his allegation of a legal injury "itself gives rise to standing." *Id.* ¶ 82. Accordingly, none of this Court's reasoning in *Perkins* or *Jackson* has any application to the constitutional concerns raised in this case.

and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976). While this is not a consideration under our State Constitution, "[a] judge's impartiality . . . implicates both federal and state constitutional due process principles." *Oakes*, 209 N.C. App. at 29, 703 S.E.2d at 484 (citing *Tumey*, 273 U.S. at 523). Accordingly, it is helpful to address the State's argument in order to thoroughly examine the due process concerns at issue in this case.

¶ 67    In "striking the appropriate due process balance" under the Fourteenth Amendment, "the Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be weighed." *Matthews*, 424 U.S. at 347-48. N.C. Gen. Stat. § 122C-268(b) provides that

> [t]he attorney, who is a member of the staff of the Attorney General assigned to one of the State's facilities for the mentally ill or the psychiatric service of the University of North Carolina Hospitals at Chapel Hill, shall represent the State's interest at commitment hearings, rehearings, and supplemental hearings held for respondents admitted pursuant to this Part or G.S. 15A-1321 at the facility to which he is assigned.
>
> In addition, the Attorney General may, in his discretion, designate an attorney who is a member of his staff to represent the State's interest at any commitment hearing, rehearing, or supplemental hearing held in a place other than at one of the State's facilities for the mentally ill or the psychiatric service of the University of North Carolina Hospitals at Chapel Hill.

N.C. Gen. Stat. § 122C-268(b) (2019). According to the language of the statute, the Attorney General has the discretion to choose whether to send a representative to pursue the State's interest in cases where, as here, a respondent has been committed to a non-State facility.

It is clear that the statute has given the Attorney General discretion. There is no indication, however, that he is so lacking in administrative and financial resources that he is unable to send a member of his staff to represent the State's interest at involuntary commitment proceedings. In recent years, the Attorney General has devoted immense State resources to national litigation in which North Carolinians have much less at stake than their constitutionally protected liberty interests. *See, e.g.*, Complaint for Declaratory and Injunctive Relief, *California v. Chao*, No. 19-CV-02826 (D.D.C. Sept. 20, 2019) (joining other states' attorneys general in suit seeking injunctive relief to allow California to set independent standards for vehicle emissions); Complaint for Declaratory and Injunctive Relief, *New York v. Trump*, No. 20-CV-05770 (S.D.N.Y. July 24, 2020) (joining other states' attorneys general in suit seeking to enjoin the Trump Administration from adding a citizenship questionnaire to the 2020 U.S. Census).

I do not question the Attorney General's judgment in pursuing such claims. He has been elected by the citizens of North Carolina to make such decisions. Nonetheless, ensuring that North Carolina citizens' due process rights are observed

prior to depriving them of their physical liberty is indisputably of paramount, steadfast importance. At a bare minimum, each of our branches of government must observe the constitutional rights guaranteed to the citizens of this State. These rights are not waivable by the Attorney General, the General Assembly, or this Court. The State's interest in declining to have an individual represent its interest in this case must yield to the constitutionally guaranteed right that each individual has in having his cause heard by an impartial tribunal prior to being deprived of his physical liberty.

¶ 70        Finally, the instant case is one of several cases pending before this Court in which the respondents argue that they were deprived of their right to an impartial tribunal. In each proceeding, the Attorney General chose not to send a member of his Office to represent the State's interest. It is apparent from the Record in this case that no one present at the proceeding, including the trial judge, was provided any explanation as to why a representative did not appear for the State. In response to Respondent's objection for lack of representation for the State, the trial judge stated,

> Because it sounds like the DA's office is refusing to do anything, and then it sounds like the Attorney General's office is refusing to do anything, and Duke and the VA are private and/or federal entities; therefore they can't.

> So you're suggesting we do nothing and not have these cases at all as a result of people failing to do their duty?

>            . . . .

I'm not gonna do that.

The Attorney General places North Carolina trial judges in an impossible situation by choosing to not send a representative to prosecute the State's case at involuntary commitment proceedings. The trial judge can either abandon her constitutional duty to remain impartial by prosecuting the State's case in the State's absence, or she can dismiss the commitment petition for lack of evidence to support commitment. The former has the effect of denying parties their constitutional right to a full and fair hearing before an impartial tribunal. The latter may prevent an individual suffering with mental illness from receiving the medical care he needs. This could be at the expense of his safety, or the safety of others. Regardless of which choice the trial judge makes, the result is a disservice to the respondents in these proceedings and to the citizens of this State.

## II. Conclusion

The process of involuntary commitment necessarily involves "a massive curtailment of liberty." *Humphrey v. Cady*, 405 U.S. 504, 509 (1972). "Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists." *Addington v. Texas*, 441 U.S. 418, 429 (1979). "The medical nature of the inquiry, however, does not justify dispensing with due

process requirements[,]" as "[i]t is precisely the subtleties and nuances of psychiatric diagnoses that justify the requirement of adversary hearings." *Vitek v. Jones*, 445 U.S. 480, 495 (1980) (citation, internal quotation marks, and alteration in original omitted).

¶ 74      Each of the errors discussed above would not have occurred were Respondent afforded the transparent structure of an adversarial proceeding held in open court with all parties present. Each of the foregoing errors, standing alone, were enough to deprive Respondent of his constitutional right to an impartial tribunal.